**Christopher KNOWLES and Mina Mann, Appellants,**

v.

**Jimmy D. WRIGHT, Appellees.**

**No. 01–08–00546–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

March 19, 2009.

Angus Joseph Dodson, Houston, TX, Robert R. Burford, Burford & Maney PC, Houston, TX, for Christopher Knowles and Mina Mann.

Matthew P. Whitley, Stephen Douglas Pritchett, Thomas Edward Ganucheau, Beck, Redden & Secrest, LLP, Houston, TX, for Jimmy D. Wright.

Panel consists of Justices JENNINGS, KEYES, and HIGLEY.

## OPINION

TERRY JENNINGS, Justice.

Appellants, Christopher Knowles and Mina Mann, challenge the trial court's rendition of summary judgment in favor of appellee, Jimmy D. Wright, in their suit against Wright for breach of contract, breach of fiduciary duty, quantum meruit, and fraud. Knowles and Mann bring four issues for our review. In their first two issues, Knowles and Mann contend that the trial court erred in granting summary judgment on their breach of contract claim on the ground that Knowles's oral contract with Wright was not "sufficiently definite" and in granting summary judgment on their claim for breach of fiduciary duty arising from a partnership on the ground that Knowles and Wright had not formed a partnership under Texas law. In their third issue, Knowles and Mann contend that the trial court erred in granting summary judgment against Mann on the

ground that she, as Knowles's former wife, does not have standing to sue Wright. In their fourth issue, Knowles and Mann contend that the trial court erred in granting summary judgment on their claims for quantum meruit, breach of fiduciary duty arising from a relationship of trust and confidence, and fraud because Wright did not seek summary judgment on those claims.

We affirm in part and reverse and remand in part.

### Factual and Procedural Background

In their second amended petition, Knowles and Mann alleged that, in 2003, Knowles, a landman, approached Wright, a friend and business associate, about a proposed "business plan to exploit the Barnett Shale," a "blanket gas reservoir" in Texas, and Wright orally agreed to be Knowles's partner in "build[ing] a business focused on the Barnett Shale." In May 2003, Wright formed Westside Energy, LLP (the "Westside Partnership") to exploit the Barnett Shale opportunities, and Knowles and Wright orally agreed that, in consideration for Knowles's presenting the opportunity to Wright, and in exchange for Knowles's further consulting work, Knowles would receive 50% of Wright's interests in the business after Wright had recovered his costs.

Knowles further alleged that, "[p]ursuant to this business arrangement," he provided consulting services and the Westside Partnership, with his assistance, "acquired several leases in the Barnett Shale and developed plans to drill wells and grow the business." Later in 2003, Wright transferred assets of Westside Partnership, "primarily the leases and business plan,"

to Westside Energy Corporation ("the Westside Corporation"), which had been a "dormant oil and gas company" owned by Keith Spicklemier, another friend of Knowles.[1] In exchange for the transfer of assets and an additional $23,000, the Westside Partnership received approximately three million shares of Westside Corporation stock and another 150,000 warrants to purchase Westside Corporation stock at 50 cents per share. Wright "repeatedly promised" Knowles that if he would continue providing consulting services, Knowles would receive a "substantial boot" of 50% of the Westside Corporation's stock. At this point, the business plan, as alleged by Knowles, was to grow Westside Corporation "to get Wright in a position to monetize his stock" in six to nine months. Again, Wright stated his promise to give Knowles 50% of his Westside Corporation shares in exchange for Knowles's continued consulting services from 2004 to 2006.

Knowles further alleged that by April 2007, Wright, "through" the Westside Partnership,[2] owned approximately 3.4 million shares of the Westside Corporation, which had since become a publicly traded corporation on the American Stock Exchange. Although, "[p]ursuant to their agreements," Knowles was entitled "to one-half of the shares that Wright and his companies had received in [Westside Corporation]," Wright, in early 2006, refused to honor "his promise," and, instead, offered to Knowles "far less than the approximately [1.7 million] shares" owed to Knowles.

Knowles and Mann asserted claims for breach of contract, breach of fiduciary duty, fraud, and quantum meruit. In sup-

---

1. Westside Corporation was formerly known as "Eventemp Corporation."

2. Westside Partnership subsequently became Westside Resources LLC, but, for convenience, we will continue to refer to it as Westside Partnership.

port of their contract claim, Knowles and Mann alleged that Knowles had a legally binding contract with Wright to "share one half of the business with Knowles" in exchange for Knowles's idea and consulting services to grow the Westside Corporation. In support of this claim for breach of fiduciary duty arising from a partnership, Knowles and Mann alleged that Knowles had formed a partnership with Wright to exploit the Barnett Shale and that, under the express terms of the partnership, Wright had agreed to share one-half of the operating business with Knowles in exchange for Knowles's idea and consulting services.

After answering, Wright filed a summary judgment motion on Knowles's claims for breach of contract and breach of fiduciary duty arising from a partnership. Wright argued that Knowles and Mann's breach of contract claim was barred as a matter of law because "the alleged oral agreement [was] unenforceable due to a lack of clear, certain, and definite terms." Wright also argued that Knowles and Mann's claim for breach of fiduciary duty arising from a partnership was barred as a matter of law because the parties did not have a fiduciary relationship. Finally, Wright asserted that Mann had no claims against Wright. Wright attached to his summary judgment motion both his and Knowles's deposition testimony. Citing to their testimony, Wright contended that none of the essential terms of the purported agreement were "clear, certain, [or] definite terms." He asserted that the purported oral agreement was not definite as to what services Knowles was obligated to perform, what Wright was required to give Knowles, and when and for how long each party would be expected to perform his respective obligations.

In his response to Wright's motion, Knowles asserted that the summary judg-

ment record "clearly define[d]" that the parties had orally agreed that, in consideration for Knowles's presentation of the opportunity to Wright and the performance of consulting work, Wright promised Knowles "50% of Wright's interest in the business after Wright had monetized the investment and recovered his cost." Knowles contended that their oral agreement "later became more specific when [Westside Corporation] was identified as the business entity that would be used to develop the Barnett Shale opportunity, whereby Wright promised Knowles 50% of his shares of [Westside Corporation] stock as soon as they became transferable." Knowles attached to his response his affidavit, in which he testified that in 2003 he approached Wright "with a plan to develop a business to invest in and exploit the Barnett Shale," and Wright agreed to the idea and further agreed to be Knowles's partner. Knowles further testified,

We agreed that, in consideration for my conceiving this idea and then offering Wright the opportunity to participate, and in exchange for my further consulting work at a reduced rate of payment, I would receive fifty percent of Wright's interests in the business after Wright had recovered his costs. Wright promised to transfer those shares as soon as they were legally transferable. The initial plan for our partnership was to purchase lease interests associated with the Barnett Shale and sell them quickly. Pursuant to this business arrangement, I provided consulting services to Wright and [Westside Partnership], including managing the land department and field personnel, identifying and presenting specific acreage, refining the business plan, and reviewing potential business acquisitions. I further negotiated for months with landowners to identify and acquire leases, conducted title searches, conducted feasibility

studies, helped manage a drilling program, and identified potential acquisition targets. Under my guidance and assistance, · [Westside Partnership] acquired several leases.... [F]rom 2003 through 2006, I devoted nearly all of my professional time and energy to the project at a significantly reduced rate of payment.

Later in 2003, we planned to raise money and drill a small number of test wells.... After establishing their value, we planned to liquidate the leases and share fifty-fifty the upside of the transactions after Wright had covered his expense. The partnership initially acquired four leases in the Barnett Shale. The leases were acquired (through my efforts) in order to benefit our partnership and were eventually taken in the name of [Westside Partnership], a limited partnership controlled by Wright. While we initially planned to flip the leases ..., we formed a more lucrative plan shortly thereafter. Pursuant to our new agreement and plan, Wright transferred [Westside Partnership's] assets (primarily the leases and business plan) to ... [Westside Corporation]. In return for Wright's contribution of the [Westside Partnership's] assets and approximately $23,000, [Westside Partnership] (Wright's Company) received approximately 3,059,585 shares of Westside Energy Corporation Stock and 153,608 warrants.... Again, Wright assured me that if I continued to provide the aforementioned consulting services, I would receive a "substantial boot" of fifty percent of Wright's [Westside Corporation] stock. Our goal was to grow [Westside Corporation] to put Wright in a position to monetize our stock in six to nine months. [Westside Corporation] later became publicly traded.... As of April 2007, Wright—through his company Westside Resources (f/k/a Westside Energy) [the Westside Partnership]—owned approximately 3,435,603 shares of [Westside Corporation's] common stock. Throughout 2004, 2005, and 2006, Wright continued to emphasize and promise to me that I would receive one-half of those shares if I hewed to the plan and kept working. Wright reiterated that he would transfer my half of the shares as soon as those shares became transferable.

. . . .

We held ourselves out as partners in the [Westside Corporation] to several parties.

Knowles also attached to his response an affidavit from Robert Hinds, an "advisory consultant" to Westside Corporation, who testified that he had worked with both Wright and Knowles and that Wright had told him that he and Knowles were partners and that Knowles would be receiving one-half of Wright's stock in Westside Corporation when Wright was allowed by the board of directors to transfer his shares. Knowles also attached to his response an affidavit from James Hillier, a commercial business developer acquainted with both Wright and Knowles, who testified that, in 2003 and 2004, he was present during conversations regarding the business plan to develop the Barnett Shale, Wright told him and Knowles that Knowles would receive fifty percent of Wright's interest in the "business entity" after Wright had recouped his investment, and Wright referred to Knowles as his partner. Hillier also testified that he was present when the parties discussed that Westside Corporation would be used to develop the leases and acquire acreage, Wright promised Knowles that they would be "fifty-fifty partners in any shares" of Westside Corporation "received by" Wright "or his companies," and Wright stated that Knowles

would receive the stock "as soon as it became transferable."

The trial court granted Wright's summary judgment motion and dismissed the claims of Knowles and Mann.

### Standard of Review

To prevail on a summary judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and that there is no genuine issue of material fact. Tex.R. Civ. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey*, 900 S.W.2d at 341; *Yazdchi v. Bank One, Tex., N.A.*, 177 S.W.3d 399, 404 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). Every reasonable inference must be indulged in favor of the nonmovant and any doubts must be resolved in its favor. *Id.* at 549. Moreover, a summary judgment must stand or fall on the grounds expressly presented in the motion. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339–41 (Tex. 1993).

### Breach of Contract

 In their first issue, Knowles and Mann argue that the trial court erred in granting summary judgment on their breach of contract claim because Knowles's oral contract with Wright was not a "best efforts" agreement and was "sufficiently definite" to be enforced under Texas law.

First, Knowles asserts that there was "no uncertainty" regarding his obligations under the contract. He argues that he was required to provide much more than his "best efforts" because, under the contract, he contributed "the initial idea" and his landman expertise while "receiving payments of about half of prevailing market rates." Knowles negotiated with landowners, conducted title and feasibility studies, managed a drilling program, and identified potential acquisitions. Alternatively, Knowles argues that even if the contract was a "best efforts" agreement, it was still enforceable because the parties had achieved their goal. Thus, "any analysis" of whether he had contributed his best efforts was unnecessary and a jury could be asked "to look to the actions that a reasonable deal originator and land consultant would have taken under similar circumstances to determine whether Knowles's . . . met that standard."

Second, Knowles argues that Wright's obligations under the oral contract were not indefinite because Wright was specifically required to transfer 50% of the shares in Westside Corporation "that he or any company controlled by him received" as soon as they became transferable. Knowles asserts that the stock became transferable when either the shares became open to trading on the stock exchange or Wright terminated his employment with Westside Corporation and sold some of his shares.

 Whether an agreement fails for indefiniteness is a question of law to be determined by the court. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex.1992); *Playoff Corp. v. Blackwell*, No. 2–06–249–CV, —— S.W.3d ——, 2008 WL 5194340, at *3 (Tex. App.-Fort Worth Dec.11, 2008, no pet.). "In order to be legally binding, a contract must be sufficiently definite in its terms so

that a court can understand what the promisor undertook." *T.O. Stanley Boot Co., Inc.*, 847 S.W.2d at 221; *see also Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex.App.-Dallas 2007, no pet.) ("For an enforceable contract to exist, the legal obligations and liabilities of the parties must be sufficiently definite."); *Playoff Corp.*, —— S.W.3d at ——, 2008 WL 5194340, at *3 ("If an alleged agreement is so indefinite as to make it impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract."). The material terms of the contract must be agreed upon before a court can enforce the contract, and "[w]here an essential term is open for future negotiation, there is no binding contract." *T.O. Stanley Boot Co., Inc.*, 847 S.W.2d at 221; *Lamajak*, 230 S.W.3d at 793 ("The contract must be certain and clear as to all essential terms or the contract will fail for indefiniteness."); *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 324 (5th Cir.2006) ("Whether a given term is 'essential' to a contract is a matter of law to be reviewed de novo, a determination turning largely on the type of contract at issue . . . .").

 "It is well established that the terms of an oral contract must be clear, certain, and definite." *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex.App.-Houston [1st Dist.] 1992, writ denied); *see also Farone v. Bag'n Baggage, Ltd.*, 165 S.W.3d 795, 802 (Tex.App.-Eastland 2005, no pet.) ("The terms of an oral contract must be definite, certain, and clear as to all essential terms; or the contract will fail for indefiniteness."). "A lack of definiteness in an agreement may concern the time of

performance, the price to be paid, the work to be done, the service to be rendered or the property to be transferred." [3] *Gannon*, 830 S.W.2d at 709; *see also Liberto*, 441 F.3d at 324. "The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably certain." *Playoff Corp.*, —— S.W.3d at ——, 2008 WL 5194340, at *3 (citing *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex.2000)). "Although Texas courts favor validating contracts, we may not create a contract where none exists." *Lamajak*, 230 S.W.3d at 793.

In his deposition testimony, when asked what the oral contract required of him, Knowles explained that he had promised Wright all of his "best effort" and "everything else, such as [his] blood, sweat, tears and anything else [he] could come up with to get it done, avoiding any and all other opportunities." When asked exactly what he was to direct his best efforts toward, Knowles responded, "Build a business enterprise of which [he] would share half of." In his affidavit testimony, Knowles testified that, under the initial oral agreement that he had with Wright, in which the parties intended to quickly flip leases for a profit, he was charged with conceiving of the idea, offering Wright the opportunity to participate, and providing "further consulting work at a reduced rate of payment." However, Knowles offered no testimony as to what specific services the oral contract actually *required* of him. In his affidavit, which is slightly more specific, Knowles described some of the consulting services that he had in fact provided "pur-

3. Additionally, "[w]ith respect to an oral agreement to transfer stock, terms must state the specific quantity of shares and the specific price in order to be considered 'clear, certain, and definite.'" *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex.App.-Houston [1st Dist.] 1992, writ denied) (citing *Consol. Petroleum Indus. v. Jacobs*, 648 S.W.2d 363, 366 (Tex.App.-Eastland 1983, writ ref'd n.r.e.)).

suant" to their initial business arrangement. He also stated that, once he and Wright had developed a more lucrative business plan to build the business rather than quickly flip the leases, he "continued to provide the aforementioned consulting services." Finally, Knowles testified that Wright had repeatedly told him that he would receive one-half of those shares if he "hewed" to the business plan and "kept working."

The bottom line is that Knowles did not offer evidence as to what exactly he was obligated to do and what specific services he was required to provide under this subsequent oral contract to build a business with Wright—terms essential to the parties' purported oral contract to build a business and ultimately sell the shares of that business for profit. *See Lamajak,* 230 S.W.3d at 793 (stating that "services to be provided" by party seeking to share in gross profits of business arrangement pursuant to alleged oral contract "were a material term of the alleged contract," concluding that there was no evidence that the parties agreed on "certain services" to be provided, and holding that evidence was legally insufficient to support breach of contract claim). This "lack of definiteness" in regard to the work to be done and the services to be rendered by Knowles under the purported oral agreement is fatal to the claim of Knowles and Mann for breach of contract. Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Wright on this breach of contract claim.

On appeal, Knowles argues that Wright has "not offered any argument that Knowles failed to perform everything that could conceivably be required under their agreement." This argument, of course, assumes the existence of a binding oral contract. It would not make sense for Wright, who is contending that the parties never entered into an oral agreement, to argue that Knowles failed to provide all services that "could conceivably be required" under the agreement if, in fact, no specific agreement existed. Knowles also cannot establish the existence of an oral contract simply by detailing the consulting services that he actually provided during the parties' business relationship.[4] *See Lamajak,* 230 S.W.3d at 794 (stating that although witnesses provided testimony about work one party provided after contract was allegedly performed, there was no evidence that parties had actually agreed to "what services" would be provided in exchange for share of gross profits).

■ Knowles further argues on appeal that because Wright has more than twenty years of experience in the oil and gas industry and was "was well aware of the role of a landman in identifying and negotiating for lease prospects," it "was not necessary" for the parties to spell out the minutiae of Knowles's "day-to-day activities in support of the venture." We agree that a contract between Knowles and Wright to "build a business" with the stated general "goal to monetize investments through the sale of shares to the public" would not necessarily need to specify Knowles's or Wright's day-to-day duties. Here, however, the purported oral agreement provided no terms as to Knowles's specific obligations, i.e., exactly what was required of Knowles so that Wright could enforce the contract against Knowles. For example, if we were to recognize the existence of an oral agreement on the evidence submitted by Knowles, how could Wright ever assert that Knowles breached the

---

4. The record contains undisputed evidence that Knowles received compensation for his consulting services, although Knowles testified that the compensation he received was below market rates.

agreement by failing to comply with the terms setting forth Knowles's obligations under the contract? There simply are no such terms. More significantly, how could a court or a jury ever make a finding as to whether Knowles complied with the oral contract in order to award Knowles fifty percent of the shares held by Wright or in a company "controlled" by Wright? Without evidence of the performance specifically required under an oral or written contract, a court simply cannot fix the legal obligations and liabilities of the parties. *See Gannon*, 830 S.W.2d at 709. In response to Knowles's suggestion that a jury or court might simply measure his conduct against the conduct of a reasonable deal originator or landman,[5] there is no evidence that the parties agreed that Knowles would receive 50% of Wright's interest if he conducted himself in accordance with these reasonable standards, whatever those standards are and however those standards would apply to the specific business arrangement here.

Moreover, even if the purported oral contract set forth sufficiently definite obligations for Knowles, it failed to provide clear, certain, and definite obligations for Wright. In his affidavit, Knowles testified that he and Wright initially planned to flip leases for a quick profit and that, after Wright recovered his costs, Knowles would be entitled to 50% of Wright's interest in whatever business was ultimately formed. According to Knowles, the men subsequently modified their original plan, and, rather than flip the leases as initially planned, the men allegedly agreed to transfer the Westside Partnership's leases and business plan, along with some cash,

to another company, Westside Corporation, in exchange for approximately three million shares of Westside Corporation. Knowles testified that, as part of this modified plan, and in exchange for Knowles's continued "aforementioned consulting services," Wright had agreed to give Knowles 50% of Wright's Westside Corporation stock as soon as the stock became transferable. Although Knowles repeatedly testified that Wright had promised him 50% of his ownership interest in whatever public entity was formed pursuant to the business plan, it is undisputed that Wright did not obtain an individual ownership interest in Westside Corporation. Rather, the shares of Westside Corporation were transferred to Westside Partnership. In an effort to account for the lack of clarity and definiteness of terms and to explain how he was to receive his shares under the purported oral contract, Knowles, in his deposition, testified that the specific terms of the deal were a "moving target," although he never "expected to work for less than half." The following exchange then occurred:

> [Wright's attorney]: When you say it was a moving target, do you mean that ... the terms of the agreement changed over time?
>
> [Knowles]: Only the entities. The entities and the counties and at which stage was going to happen. It was ... Keith [Spickelmeir] had to do a lot of background work, and [Wright] had to reform things for loans and collateral. And it was ... all over the map....

5. Knowles suggests that a jury could "simply be required to consider the actions that a reasonable deal originator and land consultant would have taken under similar circumstances to determine whether Knowles's contributions met that standard." Knowles asserts that "Wright has not offered, and cannot offer, any evidence that Knowles failed to rise to the standard of an average, prudent, comparable deal originator or petroleum landman."

In addition to these discrepancies over exactly how Knowles was to acquire 50% of certain shares from Wright, or from companies controlled by Wright, Knowles's own evidence was not clear, certain, and definite as to when he was to receive his shares and how his interest was to be calculated. First, Knowles generally agreed in his testimony that Wright was entitled to recover his "costs" or "expenses" before calculating the amounts to which Knowles was entitled under the oral contract. But as Wright notes on appeal, there is no evidence as to any agreement between the parties on how to begin calculating those "costs." Although both Wright and Knowles provided some testimony as to some monetary investments made by Wright and his companies, Wright testified in his deposition that he worked without receiving a salary for a period in 2004. It is also undisputed that Knowles received compensation from Westside Partnership or Westside Corporation for his consulting services, and the record indicates that there were likely also other employees or operating expenses that would likely need to figure into any calculation of "costs" or expenses. Without any evidence as to the parties' specific agreement on what constituted "costs" and how those "costs" were to be calculated under the purported oral contract, it would be impossible for a court to determine Wright's liabilities under the purported contract.

Similarly, there is no evidence clearly identifying the time that Wright had to transfer the shares held by Westside Corporation or the time that Knowles's obligation to provide services, at a below-market rate, to Wright or to Westside Partnership and/or Westside Corporation terminated. *See Playoff Corp.,* —— S.W.3d at ——, 2008 WL 5194340, at *4 (stating that evidence showed that "alleged agreement left a material matter open for future adjustment" and agreement never occurred); *Shaw v. Palmer,* 197 S.W.3d 854, 856 (Tex.App.-Dallas 2006, pet. denied) (concluding that summary judgment did not contain evidence of any agreement to pay "sum certain" as bonus, amount of bonus was indefinite at time of agreement and was open for future negotiation or discretion, and parties only "had a contingent agreement to agree"); *Farone,* 165 S.W.3d at 802 (holding that contract failed for indefiniteness because there were essential terms upon which there was no agreement).

We overrule the first issue of Knowles and Mann.

### Breach of Fiduciary Duty Arising from a Partnership

In their second issue, Knowles and Mann argue that the trial court erred in granting summary judgment on their claim for breach of fiduciary duty arising from a partnership because, under the circumstances, Texas law recognizes such a partnership.

Under article 2.03 of the Texas Revised Partnership Act ("TRPA"), there are five factors to consider in determining whether a partnership has been created. TEX.REV.CIV. STAT. ANN. art. 6132b–2.03(a) (Vernon Supp.2008); *Brown v. Swett & Crawford of Tex., Inc.,* 178 S.W.3d 373, 378 (Tex.App.-Houston [1st Dist.] 2005, no pet.). The factors include (1) the receipt or right to receive a share of profits of a business; (2) the expression of an intent to be partners of the business; (3) the participation or right to participate in control of the business; (4) the sharing of or agreement to share losses of the business or liability for claims by third parties against the business; and (5) the contribution of or an agreement to contribute money or property to the business. TEX.REV.CIV.

STAT. ANN. art. 6132b–2.03(a). The Texas Supreme Court has held that, to establish a partnership or joint venture, a plaintiff must show (1) a community of interest in the venture, (2) an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise. *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 176 (Tex.1997); *Brown,* 178 S.W.3d at 378. However, the Texas Revised Partnership Act provides that an agreement to share losses by the owners of a business is not necessary to create a partnership. TEX. REV.CIV. STAT. ANN. art. 6132b–2.03(c).

In evaluating Knowles's fiduciary duty claim arising from a partnership, we note that even Knowles testified that, under his purported oral agreement with Wright, he was not required to share in any losses of the partnership. According to Knowles, the financial risk regarding the investment in the partnership was to be borne solely by Wright. Also, in regard to control, when asked whether he had any control over the purported partnership, Knowles responded only that he had "input." However, Knowles agreed that he did not have any "signatory authority" for the Westside Partnership and that he did not have any authority to override Wright's business decisions. Specifically, Knowles testified,

> [Wright's attorney]: If Mr. Wright had decided . . . I'm not going to sell these leases to [Westside Corporation], I'm going to keep them in this company, you didn't have any authority in the company to override him?
>
> [Knowles]: That's correct.
>
> [Wright's Attorney]: Okay. Mr. Wright didn't come to you and ask your permission to have [Westside Partnership] sell those four leases to [Westside Corporation], did he?
>
> [Knowles]: He didn't ask permission. He just told me he was doing it.

Although Knowles subsequently testified that he and Wright made decisions together, Knowles's testimony made clear that he had no control over the purported partnership and that Wright retained ultimate control over business decisions.

Moreover, it is undisputed that Knowles did not contribute any money or property to the purported partnership. Wright provided the initial financial investment, and the leases were acquired by Westside Partnership and/or Westside Corporation. Although Knowles testified that he provided consulting services, the record demonstrates that Knowles received compensation for those services, albeit at a reduced rate. Finally, it is true that Knowles testified that there was an oral contract requiring Wright to give him 50% of the shares held by Wright, or any corporation controlled by Wright, in exchange for Knowles's consulting services. However, as we have held above, this purported oral agreement failed because the terms regarding the parties' obligations were not sufficiently definite. As noted by Wright, even Knowles himself testified that he was to receive these shares as compensation for his consulting services.

We conclude that the record establishes as a matter of law the lack of the existence of a partnership between Wright and Knowles. Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Wright on the claims of Knowles and Mann for breach of a fiduciary duty arising from a partnership.

We overrule the second issue of Knowles and Mann.

### Mann's Standing

In their third issue, Knowles and Mann, who is Knowles's former wife, contend that Mann has standing to pursue

recovery of "a share of proceeds of [the] contract or [the] partnership relationship that were earned in part during the existence" of her marriage to Knowles. Having held that the trial court did not err in granting summary judgment in favor of Wright on the claims of Knowles and Mann for breach of contract and breach of fiduciary duty arising from a partnership, we need not address the issue of Mann's standing to bring these claims and her arguments that she is entitled to pursue recovery of "a share of proceeds" from the purported partnership relationship or contract because such proceeds were earned in part during her marriage to Knowles.

We overrule the third issue of Knowles and Mann.

### Additional Claims

 In their fourth issue, Knowles and Mann argue that the trial court erred in granting summary judgment on their claims for quantum meruit, breach of fiduciary duty arising from a relationship of trust and confidence, and fraud because Wright did not seek summary judgment on those claims. Wright agrees that the trial court erred in granting summary judgment on these claims, which were added after Wright filed his summary judgment motion and which were not addressed in Wright's summary judgment motion. Accordingly, we hold that the trial court erred in granting summary judgment on Knowles and Mann's claims for quantum meruit, breach of fiduciary duty arising from a relationship of trust and confidence, and fraud. *See McConnell,* 858 S.W.2d at 339–41(summary judgment must stand or fall on grounds expressly presented in motion).

We sustain the fourth issue of Knowles and Mann.

### Conclusion

We affirm the trial court's judgment entered in favor of Wright on Knowles and Mann's claims for breach of contract and breach of fiduciary duty arising from a partnership. We reverse the trial court's judgment entered in favor of Wright on Knowles and Mann's claims for quantum meruit, breach of fiduciary duty arising from a relationship of trust and confidence, and fraud, and we remand for further proceedings consistent with this opinion.