Reversed and Rendered and Opinion filed June 8, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00875-CV

___________________

 

Parker Drilling Company & Parker Drilling
Company (Bolivia) S.A., Appellants

 

V.

 

Romfor Supply Company & Romfor West Africa
Ltd., Appellees



 



 

On
Appeal from the 269th District Court

Harris County,
Texas



Trial Court Cause No. 2006-14860

 



 

 

OPINION

Appellants Parker Drilling Company
and Parker Drilling Company (Bolivia) S.A. (collectively “Parker”) appeal from
a judgment entered in favor of appellees Romfor Supply Company and Romfor West
Africa Ltd. (collectively “Romfor”) in a breach of contract case.  In three
issues, Parker argues the evidence is legally insufficient to support the
jury’s finding of a contract between Parker and Romfor, the trial court erred
as a matter of law in awarding damages against Parker, and the trial court’s
award of attorney’s fees in favor of Romfor is erroneous.  Because we find the
evidence is legally insufficient to support the jury’s finding of a contract
between Parker and Romfor, we reverse the trial court’s judgment and render
judgment that Romfor take nothing.  

                                                                                                                                                      
I.           
Background

            Parker and Romfor
are companies engaged in drilling for oil in various locations throughout the
world.  In early 2003, Romfor learned that Parker was selling equipment out of
its worldwide fleet.  Romfor expressed interest in purchasing one of Parker’s
oil rigs located in Nigeria (“Rig 220”) because it was planning to begin
drilling operations in the Congo along with Caroil S.A., Romfor’s French
venture partner.  Romfor and Parker signed a letter of intent for Romfor to
purchase Rig 220 for $800,000.  Before a contract was finalized, Parker
informed Romfor that it was withdrawing its offer to sell Rig 220 because it
had accepted a third party’s offer.  Parker subsequently provided Romfor with a
list of other rigs available for sale, and Romfor decided to pursue an
agreement to purchase a rig located in Bolivia (“Rig 118”) for $1,745,000.  Romfor’s
president, Stuart Breckon, travelled to Bolivia in May 2003 to inspect Rig 118
and determined the rig needed certain repairs before being transported to the
Congo.  Following Breckon’s visit to Bolivia, Parker and Romfor entered into an
agreement (the “Service Agreement”) under which Parker would repair Rig 118 and
Romfor would pay Parker for the repairs.  A contract for the sale of Rig 118
was finalized in June 2003, and Parker shipped Rig 118 to the Congo during the
last week of June 2003 after completing the repairs requested by Romfor.  

            While in Bolivia,
Breckon learned that Parker was winding down drilling operations in that
country and was looking to sell much of its equipment located there.  Breckon
signed a document offering to purchase eleven pieces of equipment from Parker for
$84,000 (“Romfor’s Offer”).  Included in these eleven pieces of equipment were three
Gardner Denver PZ-9 mud pumps (the “Mud Pumps”),[1]
which Romfor offered to purchase for $6,000 each.  Parker did not officially
respond to Romfor’s Offer; however, Parker shipped the eight items other than
the Mud Pumps to Africa along with Rig 118, and Romfor later paid Parker for
these eight items.  After Rig 118 left Bolivia, Patricia Carreras, Parker’s financial
administrator, informed Breckon that Parker intended to sell the Mud Pumps to
SOCO Bolivia S.R.L. (“SOCO”)[2]
for $21,429, and that SOCO would be responsible for refurbishing and exporting
the pumps.  

Parker subsequently invoiced the pumps to SOCO (the
“Parker/SOCO Invoice”) and SOCO finished repairing the pumps.  Over the next
several months, SOCO repeatedly asked Romfor to pay the pumps’ purchase price
and repair costs, and continually informed Parker that it could not pay for the
pumps because Romfor had not yet paid SOCO for them.  In January 2004, Parker
notified SOCO that it was cancelling the sale of the Mud Pumps because SOCO had
not paid the purchase price.  SOCO cancelled the Parker/SOCO Invoice in
February 2004 and Parker regained possession of the pumps.  In April 2004,
Parker invoiced the Mud Pumps to SOCO again after SOCO informed Parker that it
had received an offer from a third party to purchase the pumps for $90,000.  Parker
re-sold the pumps to SOCO for $21,429.  SOCO kept all of the profit from the
subsequent sale to the third party.  

After being notified that Parker had regained
possession of the pumps, Romfor demanded that Parker refund Romfor $68,680, the
total amount SOCO had invoiced Romfor for repairing and storing the Mud Pumps. 
Parker refused to refund any amount, claiming there was no contract for the
sale of the Mud Pumps between itself and Romfor.  Romfor filed suit against
Parker in March 2006, alleging that Parker and Romfor contracted for the sale
of the Mud Pumps and that Parker breached this contract.  The jury found that Parker
agreed to sell the Mud Pumps to Romfor and that Parker failed to comply with
the agreement.  The jury then awarded Romfor $68,571 in damages.  The trial
court entered final judgment in Romfor’s favor, awarding Romfor $90,000 in
damages[3]
and $100,000 in attorney’s fees, along with additional contingent attorney’s
fees for appeal.  

            Parker raises
three issues on appeal.  In its first issue, Parker argues the evidence is
legally insufficient to show the formation of a contract between Parker and
Romfor for the sale of the Mud Pumps.  Next, Parker asserts there is legally
insufficient evidence to support the jury’s damage award of $68,571 and the
trial court’s final damage award of $90,000.  Finally, Parker contends the
trial court’s award of $100,000 in attorneys’ fees should be reversed because
it is legally unsupportable.  

                                                                                                                                                            
II.           
Analysis

A.   
Standard of Review

In its first issue, Parker alleges there is no
evidence of a contract between Parker and Romfor for the sale of the Mud Pumps. 
In a legal sufficiency or no-evidence review, we determine whether the evidence
would enable reasonable and fair-minded individuals to reach the verdict under
review.  See City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). 
While conducting this review, we credit favorable evidence if reasonable jurors
could and disregard contrary evidence unless reasonable jurors could not.  See
id.  Jurors are the sole judges of the credibility of the witnesses and the
weight to give their testimony, and we cannot impose our own opinions to the
contrary.  Id. at 819.  We must consider the evidence in the light most
favorable to the finding under review and indulge every reasonable inference
that would support it.  See id. at 822.  We must, and may only, sustain
no evidence points when either (1) the record reveals a complete absence of
evidence of a vital fact, (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact,
(3) the evidence offered to prove a vital fact is no more than a mere
scintilla, or (4) the evidence conclusively establishes the opposite of the
vital fact.  See id. at 810.  

B.    
Elements of Contract Formation 

To recover for breach of contract, a plaintiff must
show (1) the existence of a valid contract, (2) the plaintiff performed or
tendered performance, (3) the defendant breached the contract, and (4) the
plaintiff suffered damages as a result of defendant’s breach.  Aguiar v.
Segal, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet.
denied).  A legally enforceable contract consists of (1) an offer, (2)
acceptance in strict compliance with the terms of the offer, (3) a meeting of
the minds, (4) each party’s consent to the terms, and (5) execution and
delivery of the contract with the intent that it be mutual and binding.  Wal-Mart
Stores, Inc. v. Lopez, 93 S.W.3d 548, 555–56 (Tex. App.—Houston [14th
Dist.] 2002, no pet.); see also Akib Constr., Inc. v. Neff Rental, Inc.,
No. 14-07-00063-CV, 2008 WL 878935, at *3 (Tex. App.—Houston [14th Dist.] Apr.
3, 2008, no pet.) (mem. op.).  Whether the parties reached an agreement is a
question of fact.  Advantage Physical Therapy, Inc. v. Cruse, 165 S.W.3d
21, 24 (Tex. App.—Houston [14th Dist.] 2005, no pet.).  Whether an agreement is
legally enforceable, however, is a question of law.  See id.; Gaede
v. SK Invs., Inc., 38 S.W.3d 753, 757 (Tex. App.—Houston [14th Dist.] 2001,
pet. denied).  

In this case, there is no writing signed by Parker
acknowledging its acceptance of Romfor’s Offer.[4] 
However, the jury could properly imply the formation of a contract between
Parker and Romfor from any conduct by both parties recognizing the existence of
a contract.  See Tex. Bus. &
Com. Code Ann. § 2.204(a) (Vernon 2009); Adams v. H&H Meat
Prods., Inc., 41 S.W.3d 762, 771 (Tex. App.—Corpus Christi 2001, no pet.); see
also Wal-Mart, 93 S.W.3d at 557 (describing implied contracts as those
inferred from the acts and conduct of the parties when the facts and
circumstances show a mutual intent to contract).  The existence of an implied
contract involves inferences drawn from circumstantial evidence and is
therefore a question of fact.  See Domingo v. Mitchell, 257 S.W.3d 34,
40 (Tex. App.—Amarillo 2008, pet. denied); Ishin Speed Sport, Inc. v.
Rutherford, 933 S.W.2d 343, 348 (Tex. App.—Fort Worth 1996, no writ).  Questions
of contract formation must be resolved on objective standards, based upon the
meaning reasonably conveyed by the parties’ actions and words rather than their
uncommunicated subjective intentions.  Harrison v. Williams Dental Group,
P.C., 140 S.W.3d 912, 916 (Tex. App.—Dallas 2004, no pet.); Angelou v.
African Overseas Union, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.]
2000, no pet.).  We view the conduct and circumstances surrounding the transaction
from a reasonable person’s interpretation at that particular point in time.  Wal-Mart,
93 S.W.3d at 557–58.  

According to Parker, the only contract for the sale
of the Mud Pumps shown by the evidence is between Parker and SOCO.  Romfor
argues a contract between itself and Parker is clearly shown by the Sales and
Service Agreements, Romfor’s Offer,[5]
and the parties’ actions.  After reviewing the record, we conclude there was no
contract between Parker and Romfor for the sale of the Mud Pumps.  There was no
meeting of the minds between Parker and Romfor regarding the pumps, and the
parties’ conduct shows that Parker contracted to sell the pumps to SOCO.  

1.      No
Evidence of Acceptance of Romfor’s Offer 

Parker contends the evidence shows it did not accept
Romfor’s Offer in accordance with its terms and that “a different plan for the
[Mud Pumps] was understood and followed by both Parker and Romfor.”  To create
an enforceable contract, there must be a clear and definite offer followed by a
clear and definite acceptance in accordance with the offer’s terms.  See Levin
Law Group, P.C. v. Sigmon, No. 14-08-01165-CV, 2010 WL 183525, at *3 (Tex.
App.—Houston [14th Dist.] Jan. 21, 2010, pet. filed) (mem. op.); Angelou,
33 S.W.3d at 278.  A purported acceptance that changes or qualifies an offer’s
material terms constitutes a rejection and counteroffer rather than an
acceptance.  See Lewis v. Adams, 979 S.W.2d 831, 834 (Tex.
App.—Houston [14th Dist.] 1998, no pet.); see also Knowles v. Wright,
288 S.W.3d 136, 143 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)
(recognizing the material terms of a contract must be agreed upon before a
contract may be enforced).  

The question of whether a contract contains all the
essential terms for it to be enforceable is a question of law.  See Beal
Bank, S.S.B. v. Schleider, 124 S.W.3d 640, 653 n.8 (Tex. App.—Houston [14th
Dist.] 2003, pet. denied).  Contracts should be examined on a case-by-case
basis to determine which terms are material or essential.  T.O. Stanley Boot
Co. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992); see also John
Wood Group USA, Inc. v. ICO, Inc., 26 S.W.3d 12, 20 (Tex. App.—Houston [1st
Dist.] 2000, pet. denied) (listing the essential elements for a contract for
sale as (1) the object of the contract or thing sold, (2) the consideration to
be paid, and (3) the parties’ consent to the exchange); cf. Black’s Law Dictionary 1510 (8th ed.
2004) (defining “material terms” as “contractual provision[s] dealing with a
significant issue such as subject matter, price, payment, quantity, quality,
duration, or the work to be done”).  Here, Romfor’s Offer contains the
following material terms: (1) Romfor will purchase eleven items of equipment
from Parker, including the Mud Pumps, (2) Romfor will pay Parker $84,000 for all
eleven items, and (3) the Mud Pumps will be exported out of Bolivia while the
remaining eight items are to be shipped along with Rig 118 to the Congo.  

The record does not reflect a written response by
Parker to Romfor’s Offer until July 10, 2003, when Carreras sent an e-mail
changing several of the offer’s terms to Breckon.  The e-mail states, in
relevant part: 

As you will see [the Mud Pumps]
are still in [Bolivia] for repairs.  Due to local regulations, we will need to
bill these with a local invoice, subject to VAT and Transaction Tax.  The plan
is for SOCO to be the buyer so they can finish the repairs and take care of the
exportation whenever that happens.  By doing this we can release Parker from
the operations related to this sale, and hopefully wrap up everything in July.

Carreras’s
e-mail also includes a document that further modifies Romfor’s Offer by
separating the Mud Pumps from the other eight items Romfor wanted to purchase
and breaking the $84,000 Romfor was willing to pay for all eleven items into
two groups: $21,429 for the pumps[6]
and $66,000 for the remaining eight items.  

It is clear that Carreras’s
e-mail changed several of the material terms of Romfor’s Offer, including (1)
the total number of items Romfor would purchase from Parker, (2) the total
price Romfor would pay Parker for these items, (3) the price for the Mud Pumps,
and (4) the party who would ultimately purchase the Mud Pumps from Parker.  See
John Wood Group USA, 26 S.W.3d at 20.[7]
 By changing the material terms of the offer, Carreras’s e-mail constitutes a
rejection of Romfor’s Offer and a counteroffer.  See Knowles, 288 S.W.3d
at 143; Lewis, 979 S.W.2d at 834.  Breckon acknowledged receiving this
notification and stated he did not object because the sale of Mud Pumps was a
relatively small portion of the Rig 118 project.  This shows that Romfor was
aware Parker planned to sell the pumps to SOCO and the parties acted according
to this understanding.  Romfor had ample notice that Parker did not accept its
offer to purchase all eleven pieces of equipment in strict compliance with the
offer’s terms, thus negating an essential element of contract formation.  See,
e.g., Wal-Mart, 93 S.W.3d at 555–56.  

2.      No
Evidence of A Meeting of the Minds or Mutual Assent 

Romfor argues Carreras’s e-mail does not show a
rejection of Parker’s Offer because it was not sent until after Parker
transported Rig 118 and the other eight items included in Romfor’s Offer to
Africa.  According to Romfor, Parker’s shipment of the eight additional items
shows that Parker accepted Romfor’s Offer, thereby creating a contract for the
sale of the Mud Pumps.  In response, Parker argues the actions and communications
of the parties show no meeting of the minds or mutual intent to contract for
the sale of the Mud Pumps.  We conclude that the acts of the parties related to
the Mud Pumps do not show the existence of a contract between Parker and
Romfor.  

Regardless of whether a contract is based on express
or implied promises, mutual assent must be present.  Mann Frankfort Stein
& Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 850 (Tex. 2009).  In
cases involving implied contracts, mutual intent is inferred from the
circumstances.  Id.  In determining whether mutual assent is present,
courts consider the communications between the parties, the acts and
circumstance surrounding the communications, and any course of dealing between
the parties.  See Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros.
Welding Co., 480 S.W.2d 607, 609 (Tex. 1972); Angelou, 33 S.W.3d at 278. 
The minds of the parties must also meet with respect to the agreement’s subject
matter and essential terms.  See Wal-Mart, 93 S.W.3d at 556.  The
determination of a meeting of the minds is based on the objective standard of
what the parties said and did, not on their subjective states of mind.  Angelou,
33 S.W.3d at 278.  This determination is a question of fact, and the factfinder’s
decision that one party reasonably drew the inference of a promise from the
other party’s conduct will be given legal effect.  Id.; see also Fraud-Tech,
Inc. v. Choicepoint, Inc., 102 S.W.3d 366, 386 (Tex. App.—Fort Worth 2003,
pet. denied).  The parties’ conduct determines the terms of the contract on
which the parties’ minds met.  See Wal-Mart, 93 S.W.3d at 557.  

According to Breckon, Parker indicated it would provide
Romfor additional equipment related to Rig 118 at a discount because Parker
withdrew its offer to sell Rig 220 to Romfor.  Breckon testified he “offered
very low prices” in Romfor’s Offer to “make back some of this bait and switch
that [Parker] had done” with the price difference between Rig 220 and Rig 118. 
Romfor argues that these facts, considered with the parties’ actions and
communications surrounding the Sales Agreement and the Service Agreement, show
a meeting of the minds between Parker and Romfor.  The evidence, however,
proves the contrary.  

Neither the Sales Agreement nor the Service Agreement
mentions any of the items included in Romfor’s Offer.  The Service Agreement simply
states that Parker will be responsible for “perform[ing] certain services in
connection with Rig 118.”  Romfor argues these “certain services” included
refurbishing and exporting the Mud Pumps according to the terms of Romfor’s
Offer.  There is, however, no evidence that Parker was involved in repairing
the Mud Pumps.  Instead, Parker released the pumps to SOCO, who then informed
Romfor that it was repairing the pumps.  Carreras subsequently notified Romfor
that Parker would sell the pumps to SOCO.  Breckon acknowledged receiving this
notification, and Romfor voiced no objection.  All of the communications
regarding repairs performed on the Mud Pumps were between Romfor and SOCO. 
This course of dealing is different than Parker’s involvement in the repairing
of Rig 118.  The Rig 118 repairs were overseen by Mike Alborta, Parker’s
operations manager, and performed by ex-Parker employees selected by Romfor and
hired by SOCO.  Alborta, along with many of the individuals hired by SOCO,
obtained employment with Romfor and went to the Congo with Rig 118 at the end
of June 2003.  This left Parker with no representatives involved in repairing
the Mud Pumps.  Breckon acknowledged at trial that SOCO was involved in
repairing the Mud Pumps in exactly the same way as Parker was involved in the
Rig 118 project, thus differentiating Parker’s obligations under the Service
Agreement and its activities related to the pumps.  

Additionally, none of the documentary evidence in the
record points to a contract for the Mud Pumps between Parker and Romfor.  Parker’s
communications to Romfor plainly state that SOCO would purchase the pumps from
Parker, and the Parker/SOCO Invoice does not mention Romfor.[8]  Carreras
testified the Parker/SOCO Invoice constituted a transfer of ownership and that
Parker removed the pumps from its asset records after issuing the invoice. 
Carreras and Breckon both testified that Parker, Romfor, and SOCO understood
that Parker would not be paid the pumps’ $21,429 purchase price until Romfor
first paid SOCO.  Parker continuously looked to SOCO for payment of the
purchase price and only SOCO attempted to recover funds related to the Mud
Pumps directly from Romfor.[9] 
Additionally, none of Parker’s documentation related to the Service Agreement reference
the Mud Pumps.  In September 2003, Parker invoiced Romfor $230,537.61 for Service
Agreement obligations.  This amount included $66,000 for the eight items from
Romfor’s Offer shipped with Rig 118 but does not include any amount for the Mud
Pumps.  Romfor paid the $230,537.61 directly to Parker, and Breckon
acknowledged the $66,000 charge for additional assets sent with Rig 118 did not
include the Mud Pumps.  

This evidence clearly shows that each of the parties
acted as though Parker sold the Mud Pumps to SOCO, not to Romfor.  Parker
invoiced the Mud Pumps to SOCO, only SOCO was involved in repairing and seeking
payment for the pumps, and the pumps were not included in any of Parker’s
requests for payment under the Sales or Service Agreements.  After objectively
reviewing the parties’ communications, acts, and circumstances surrounding the
communications, we find there was no meeting of the minds or mutual intent to
contract for the sale of the Mud Pumps between Parker and Romfor.  See Haws
& Garrett, 480 S.W.2d at 609; Angelou, 33 S.W.3d at 278.  Also,
based on the evidence showing that Romfor did not object to Parker’s proposal
to sell the pumps to SOCO, we conclude the jury could not determine that Romfor
could reasonably infer a promise by Parker to sell the Mud Pumps to Romfor.  See
Fraud-Tech, 102 S.W.3d at 386; Angelou, 33 S.W.3d at 278.  Therefore,
the evidence shows there was no meeting of the minds or mutual assent to
contract between Parker and Romfor.  See Levin Law Group, 2010 WL
183525, at *4–5 (concluding no contract to mediate existed where the
“communications between the parties and the acts and circumstances surrounding
those communications” did not indicate a meeting of the minds regarding the
essential terms of an alleged contract to mediate); see also Wal-Mart,
93 S.W.3d at 557 (stating a meeting of the minds regarding contract terms is
determined by the parties’ conduct).  

Although Texas law favors validating transactions
rather than voiding them, a reviewing court may not create a contract where
none exists.  See Knowles, 288 S.W.3d at 143.  After reviewing the
evidence in the light most favorable to the verdict, we find that Romfor failed
to prove each of the elements necessary to establish the existence of a legally
enforceable contract.  See Advantage Physical Therapy, 165 S.W.3d at 24
(recognizing the existence of a legally enforceable agreement is a question of
law); Wal-Mart, 93 S.W.3d at 555–56 (stating there must be a meeting of
the minds and acceptance in strict compliance with an offer’s terms to form a
valid contract).  This renders the evidence legally insufficient to support the
jury’s verdict.  See City of Keller, 168 S.W.3d at 810 (stating evidence
is legally insufficient when record reveals a complete absence of a vital fact). 
Accordingly, we sustain Parker’s first issue.  

C.    Parker’s
Remaining Issues 

            Because there is
legally insufficient evidence of a contract between Parker and Romfor, Romfor
is not entitled to recover breach-of-contract damages.  See Peterson
v. Jansen, No. 14-07-00535-CV, 2009 WL 334915, at *6 (Tex. App.—Houston
[14th Dist.] Feb. 12, 2009, no pet.) (mem. op.) (listing the existence of a
valid contract as a prerequisite to recovery for breach of contract); Aguiar,
167 S.W.3d at 450 (same).  Additionally, an award of attorney’s fees in a
breach of contract claim is appropriate only if a party prevails and recovers
damages.  See Tex. Civ. Prac.
& Rem. Code Ann. § 38.001(8) (Vernon 2008) (allowing recovery
of attorney’s fees in valid claims involving oral or written contracts); State
Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 437 (Tex. 1995); Peterson,
2009 WL 334915, at *6.  Thus, there is no legal basis for the recovery of
either damages or attorney’s fees and the awards in the judgment for damages
and attorney’s fees fail on this basis.  Thus, we do not reach Parker’s second
issue challenging the sufficiency of the evidence to support the damages award
or Parker’s third issue challenging the reasonableness of the attorney’s fees
awarded.  

                                                                                                                                                 
III.           
Conclusion

            After reviewing the evidence in the light most
favorable to the verdict, we find the evidence is legally insufficient to show
the existence of a contract for the sale of the Mud Pumps between Parker and
Romfor.  Because no legally enforceable contract was formed in this case,
Romfor is not entitled to recover breach-of-contract damages or attorney’s
fees.  Accordingly, we reverse the trial court’s judgment and render judgment
that Romfor take nothing.       

                                                                                    

                                                                        /s/        Leslie
Yates

                                                                                    Justice

 

Panel consists of Justices Yates, Frost,
and Brown.                                                                                                                                                       

                                                                                                

 

 

 









[1] Mud pumps act as the
“circulatory system” for the drilling rig by circulating drilling fluid down
drilling holes.  





[2] SOCO is a Bolivian
company that assisted in Rig 118’s repairs by coordinating catering and
transportation services and by hiring ex-Parker employees selected by Romfor to
repair the rig.  





[3] The trial court added
$21,429—the amount SOCO ultimately paid Parker for the Mud Pumps—to the jury’s
damage award.  





[4] Romfor contends Parker
raises a statute of frauds defense on appeal and that Parker waived this
argument by failing to raise the issue before the trial court.  See Tex. R. Civ. P. 94 (listing statute of
frauds as an affirmative defense); Swinehart v. Stubbeman, McRae, Sealy,
Laughlin & Browder, Inc., 48 S.W.3d 865, 875 (Tex. App.—Houston [14th
Dist.] 2001, pet. denied) (stating statute of frauds defense is waived if it is
not pleaded).  We agree with Parker that this contention lacks merit, as Parker
is simply challenging the legal sufficiency of the evidence to prove the
existence of any contract, written or otherwise, to sell the Mud Pumps between
itself and Romfor.  





[5] We note that each of
these documents were executed at different times and do not expressly refer to
one another.  However, we may consider them together to ascertain the parties’
intent.  See City of Keller, 168 S.W.3d at 811; Fort Worth Indep.
Sch. Dist. v. City of Fort Worth, 22 S.W.3d 831, 840 (Tex. 2000). 
Additionally, although Parker and Caroil are the Service Agreement’s only
signatories, Romfor was heavily involved in negotiating the Sales Agreement,
the Sales Agreement provides for written notices to be copied to Romfor and
names Romfor as Rig 118’s purchaser, and Caroil’s payment of the rig’s purchase
price was coordinated by Romfor.  





[6] This total includes
$6,000 for each individual Mud Pump plus an additional $3,428.57 in taxes.  





[7] See also Potcinske v.
McDonald Prop. Invs., Ltd., 245 S.W.3d 526, 530–31 (Tex. App.—Houston [1st
Dist.] 2007, no pet.) (upholding trial court’s determination that no contract
was formed between parties where offeree changed offer’s financing option, a
material term, and offeror failed to accept the requested change); Gasmark,
Ltd. v. Kimball Energy Corp., 868 S.W.2d 925, 928 (Tex. App.—Fort Worth
1994, no writ) (determining offeree significantly altered terms of natural gas
purchase and sales contract offer by sending an amended purchase agreement changing
billing and payment provisions); cf. Adams, 41 S.W.3d at 768–73 (finding
buyer liable for breach of contract damages where seller was not paid for three
shipments of meat products delivered by seller to intermediary, despite
non-existence of signed writing by buyer guaranteeing payment for delivery to
intermediary, where buyer instructed seller to send product to intermediary for
permit purposes and unpaid shipments directly matched buyer’s orders).  





[8] In one internal e-mail
discussing SOCO’s interest in purchasing equipment from Parker, Carreras states
“as a reference[,] we sold RomFor [sic] PZ-9’s at USD 6,000 each.”  Romfor
argues this evidence shows the pumps were, in fact, sold by Parker to Romfor. 
This statement is conclusively negated by the undisputed documentary and
testimonial evidence showing the only party ever invoiced or billed for the
pumps by Parker was SOCO.  This e-mail does not constitute legally sufficient
evidence to show the formation of a contract between Parker and Romfor.  See
City of Keller, 168 S.W.3d at 820 (stating jury may not credit evidence
that is conclusively negated by undisputed facts).  





[9] Romfor points to a
September 19, 2003 e-mail from Carreras to Breckon referencing several
“SocoRomfor” invoices—including the Parker/SOCO Invoice—as evidence that Parker
sought payment for the pumps directly from Romfor.  However, the e-mail clearly
asks Breckon to “coordinate with SOCO to make the payment so [Parker] can
collect the money that is pending.”  This message does not show that Parker
sought payment of the purchase price from Romfor.