**Reversed and Rendered and Majority and Dissenting Opinions filed May 9, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-00644-CV

---

## CITRIN HOLDINGS, LLC AND JACOB CITRIN, Appellants

## V.

## MATTHEW MINNIS AND CULLEN 130, LLC, Appellees

---

**On Appeal from the 133rd District Court**
**Harris County, Texas**
**Trial Court Cause No. 2006-78939**

---

## M A J O R I T Y   O P I N I O N

Appellees, Matthew Minnis and Cullen 130, LLC ("the Minnis Parties"), and appellants, Jacob Citrin and Citrin Holdings, LLC ("the Citrin Parties"), went into business to acquire and develop industrial properties located near airports and seaports. The Minnis Parties alleged that the Citrin Parties excluded them from the business when their business relationship deteriorated. The Minnis Parties sued the Citrin Parties for breach of fiduciary duty, breach of contract, fraud, minority

oppression, and conspiracy to, and/or aiding and abetting, breach of fiduciary duties.

The case was tried to a jury, which found for the Minnis Parties on all their claims, awarded actual damages for each claim in the amount of $28,231,871, and awarded exemplary damages in the amount of $14,154,000. Upon the Minnis Parties' election, the trial court entered judgment in favor of Cullen 130 on its claim for breach of fiduciary duty, awarding actual and exemplary damages in accordance with the jury's verdict, and also attorney's fees.[1] The trial court further provided that the Minnis Parties may recover on any one of their "alternative" claims in case we reverse the judgment on Cullen 130's breach of fiduciary duty claim.

The Citrin Parties appeal the trial court's judgment on Cullen 130's breach of fiduciary duty claim. In conditional cross-points, the Minnis Parties assert, in case we reverse the judgment on Cullen 130's breach of fiduciary duty claim, that we can affirm the judgment on any of their alternative claims. We reverse the trial court's judgment and render judgment that the Minnis Parties take nothing on their claims against the Citrin Parties.

## I. BACKGROUND

### A. Formation of the Business

Jacob Citrin and Matthew Minnis first met in 2002. At the time, Citrin was working for, and had an interest in, International Airport Centers ("IAC"). Minnis was a broker for Eagle Global Logistics ("Eagle"). Eagle leased a building that Citrin was responsible for leasing. Minnis approached Citrin about IAC's buying a building Eagle owned, the 160 McClellan building. Although IAC decided not to

---

[1] The issue of attorney's fees was tried to the court.

purchase 160 McClellan, Citrin and Minnis purchased it through an entity called Horizon/McClellan, LLC. Citrin's entity, Cargo Ventures Massachusetts, LLC, and Minnis's entity, Southwest Industrial, LLC, each held a 50% interest in Horizon/McClellan.

In 2003, Citrin and Minnis started talking about going into business together to buy property near airports and seaports, lease the property out, and then sell the property. Citrin, Minnis, and their attorneys spent a number of months negotiating an operating agreement for Cargo Ventures, LLC ("Cargo Ventures New York"),[2] which would pursue opportunities to purchase property and manage projects. Cargo Ventures New York, which was Citrin's company, was already in existence. Under this operating agreement, dated September 30, 2004, Minnis's company, Cullen 130, was admitted as an additional member, holding a 45% interest; Citrin's company, Citrin Holdings, held a 55% interest. Citrin was the manager of Cargo Ventures New York.

Under the business arrangement, a bank would lend most of the money to purchase and develop the properties. An equity investor, Millennium Partners, a company owned by Citrin's father-in-law, Christopher Jeffries, provided the rest of money.

A single-purpose entity would hold title to each property acquired. The members of the single-purpose entities were to be an entity created by Citrin Holdings and Cullen 130 and a Millennium entity. The Citrin Holdings/Cullen 130 entity was known as Cargo Investors, LLC.[3] Citrin Holdings had a 55% interest in Cargo Investors, and Cullen 130 had a 45% interest. Citrin Holdings and Cullen

---

[2] Cargo Ventures New York is a New York limited liability company.

[3] Cargo Investors is a Delaware limited liability company.

130 later created another entity, Cargo Investors II, LLC,[4] for the purpose of "pursu[ing] a particular project located near Miami, Florida and commonly known as the Miami Free Zone." As further explained below, Citrin Holding held an 80% interest in Cargo Investors II, and Cullen 130 held a 20% interest.

Under the original arrangement between Millennium and Cargo Investors, Millennium would receive an 8% preferred return on its investment. The "Sharing Ratio" of the profits was 75% for Millennium and 25% for Cargo Investors. Only after Millennium was repaid its original investment, plus the 8% preferred return, would Millennium and Cargo Investors share in the profits. The Cargo Investors' 25% share and Millennium's 75% share of the profits was known as the "carried interest."[5] Later, the arrangement would be modified to a 12% preferred return for Millennium and a sharing ratio of 50% for Millennium and 50% for Cargo Investors. With regard to Cargo Investors II, Millennium would receive a 12% preferred return, and the sharing ratio would be 50% for Millennium and 50% for Cargo Investors II.

Agreements covering the single-purpose entities in which Cargo Investors was a member provided that the Millennium entity would decide whether to sell the property. Those agreements provided for the creation of a "Members

---

[4] Cargo Investors II is a Delaware limited liability company.

[5] Early on in the development of their business, Citrin and Minnis worked on acquiring the Lowe opportunity and the Cove portfolio. The Lowe opportunity consisted of three vacant buildings and a vacant parcel of land in Los Angeles. The contract between MP Cargo LAX I, LLC, a Millennium entity, and Cargo Ventures New York, provided that they would share profits— Cargo Ventures New York receiving a 25% "incentive fee" if the property sold, and the other 75% going to Millennium, after Millennium was paid back its equity and an 8% preferred return. The Cove portfolio consisted of six buildings across the U.S., which Eagle leased and had the right of first refusal. The contract between MP Cove Properties, LLC, a Millennium entity, and Cargo Ventures New York provided that they would share profits—Cargo Ventures New York receiving a 25% incentive fee if the property sold, and the other 75% going to Millennium, after Millennium was paid back its equity and an 8% preferred return. The incentive fee was similar to the carried interest.

4

Committee," comprised of "four natural persons." Millennium appointed three committee members and Cargo Investors appointed one. Thus, Millennium had three votes and Cargo Investors had one.

The "Members Committee" under the agreement covering the Miami Free Zone was comprised of "two natural persons." Millennium and Cargo Investors II each appointed one committee member with one vote. Approval of any action by the committee required the affirmative vote of both committee members.

The single-purpose entity agreements further provided that any transfer of Cargo Investors' or Cargo Investors II's membership interest "shall be to an entity controlled by Jacob Citrin and at least 51% owned by Jacob Citrin."

Minnis alleges that, prior to the signing of Cargo Venture New York operating agreement, he and Citrin entered an oral agreement creating an "overarching" partnership. Subsequently, Minnis and Citrin signed a piece of paper that said, "We are partners. Jake Citrin, Matt Minnis, 45% and 55%." Minnis, who framed the "partnership agreement," claims that it confirmed the creation of the overarching partnership under which Cargo Ventures New York, Cargo Investors, and Cargo Investors II would be created. Citrin, on the other hand, denies that he and Minnis had a partnership distinct from their relationship in the Cargo Entities; according to Citrin, the "partnership" was subsumed into the Cargo Ventures New York operating agreement.

### B. Negotiation of New Terms with Millennium

Eventually problems began to develop between Citrin and Minnis. Minnis complains that Citrin negotiated new terms with Millennium that benefitted Millennium. Citrin testified that he and Minnis were looking for new investors, and an entity known as Opus expressed some interest in 2005. Minnis testified that

5

Opus was offering better terms than what they had with Millennium: Opus would put up all the money for an 8% preferred return and would to split the profits 50/50. Minnis claimed that Citrin told him Millennium was willing to match the terms Opus was offering. No deal was ever reached with Opus, and new terms were negotiated with Millennium: a 12% preferred return and a 50/50 split of the profits. Minnis was not involved in the negotiations with Millennium and later learned of the new terms with Millennium. Minnis "just wanted the 50/50 and the 8 percent just like Opus."

Citrin testified that there was never a formal offer from Opus, and Opus called off talks because it was not "comfortable going into a business deal with [Citrin] because [he] was in litigation with [his] former employer, IAC." Citrin further stated that Millennium was never willing to agree to terms of a 50/50 split and an 8% preferred return, and he never told Minnis that Millennium had agreed to such terms. A term sheet entitled, "Cargo Ventures Logistics Portfolio," that was being discussed with Millennium showed an 8% preferred return and a 50/50 split. Citrin explained that he believed the new terms with Millennium—a 50/50 split with a 12% preferred return—were better than the previous terms—25% to Cargo Ventures, and 75% to Millennium with an 8% preferred return—because, even though Millennium would be paid more on its investment with the 12% return, the Cargo Entities would have a "bigger portion" if the property sold. Citrin testified that he and Minnis "jointly" made the decision on the new terms with Millennium.

## C. Employee Profit Sharing

A dispute arose over sharing profits with certain key employees. In order to provide interests to those key employees, Citrin gave Minnis a proposal in September 2006, in which he wanted to reduce Minnis's interest from 45% to 25%,

and Citrin's interest would be reduced from 55% to 51%. Minnis was willing to have his interest reduced "point for point" with Citrin's interest, but Citrin was not. Minnis testified that Citrin's interest would actually increase to 59% because they would be allowing for an 8% interest to a future CFO. Minnis testified that this reduction was not on a prospective basis, but would be retroactive from the beginning. Minnis stated that he had no knowledge that Citrin had promised other employees an interest in the business when he hired them. According to Minnis, it was a "take-it-or-leave-it offer." Those key employees never received any interest in the business.

### D. Cargo Investors II

Another dispute arose over the Miami Free Zone project. Citrin and Minnis were in Miami working on that project about three weeks before the project closed, when Citrin told Minnis that he was no longer "comfortable" with their arrangement, and he was not going to allow Minnis to share in any of the Miami Free Zone project. Citrin then said, "I'm going to take the whole project, and don't worry. I'm just going to hold it for you." Minnis did not agree to that arrangement, and Citrin eventually agreed to give Minnis a 20% interest in the Miami Free Zone project, while Citrin would have an 80% interest. Citrin told Minnis that he could "[t]ake it or leave it." In 2006, Citrin Holdings and Cullen 130 created Cargo Investors II for the specific purpose of pursuing the Miami Free Zone project, with Cullen 130 holding a 20% interest, and Citrin Holdings holding an 80% interest.

### E. Dissolution of the Cargo Entities & Post-Dissolution Actions

Minnis was eventually ousted from the business in late 2006. Citrin claimed Minnis told him after Thanksgiving 2006 that he wanted out of their business. On December 4, 2006, Citrin Holdings gave notice of its demand for a member

meeting for the Cargo Entities for the purpose of dissolving each of the companies. On December 13, 2006, Cullen 130 filed suit against Citrin, Citrin Holdings, and the Cargo Entities for fraud and negligent misrepresentation, and requested an accounting.

At a December 15, 2006 meeting of the investment committee of MP Industrial Ventures, LLC, a Millennium entity, a senior Millennium employee "posed a question to Mr. Citrin asking why we aren't, in fact, looking at selling all or substantially of the company's assets." Citrin responded that the "business plan is one that involves growing the company and that selling the portfolio is not a current objective." Minnis complains that he was not invited to attend that meeting.

On December 22, 2006, Citrin removed Minnis as president of Cargo Ventures New York and terminated his access to the company network and premises. After deferring a vote on dissolution of the Cargo Entities on several occasions, Citrin, on behalf of Citrin Holdings, voted to dissolve the companies on March 13, 2007.

Citrin had organized Cargo Ventures Delaware, LLC on March 12, 2007.[6] Cargo Ventures Delaware is not in a different business from Cargo Ventures New York; it has the same employees, office, and furniture, and it eventually took over most of Cargo Venture New York's project management agreements. Citrin also created additional companies to take over other Cargo Ventures New York project management agreements. According to Mark Pasquerella, comptroller of both Cargo Ventures New York and Cargo Ventures Delaware, beginning in early 2007, about $200,000 was being transferred a month from Cargo Ventures New York to

---

[6] Citrin Ventures, LLC became Cargo Ventures, LLC, whose name was eventually changed to Cargo Ventures Delaware, LLC.

Cargo Ventures Delaware. In June 2007, Cargo Ventures Delaware obtained a $1 million loan from Millennium, which is secured by the Cargo Entities' projects. Minnis has no interest in Cargo Ventures Delaware.

Citrin also usurped opportunities on which Minnis had worked. Cargo Ventures New York spent $6.5 million pursuing an opportunity known as the Bronstein building. The purchase of the Bronstein building was approved at the December 15, 2006 investment committee meeting of MP Industrial Ventures. Citrin admitted that he "took" Bronstein, and he "did not permit [Bronstein] to be closed into an entity that Matt Minnis was an owner of."

MMT was another opportunity Cargo Ventures New York started pursuing while Citrin and Minnis were still doing business together. Cargo Ventures New York was the sole member of Marin Terminal Development, LLC which was formed to pursue MMT. In June 2007, Cargo Ventures New York, with Citrin acting as manager, gave up its interest in MMT. In the restated LLC agreement for Marine Terminal Development, Cargo Ventures New York "acknowledge[d] and agree[d] that it d[id] not have an equity interest in or Sharing Ratio of the Company." Citrin's company, Citrin Investors, LLC, and a Millennium entity, MPI Consolidated Assets LLC, each had a 50% sharing ratio. Citrin explained that this agreement clarified that Cargo Ventures New York never should have owned the MMT opportunity. When Cargo Ventures gave up its interest, Minnis no longer had any part of MMT, and Citrin did not pay Minnis for the MMT opportunity.

Effective January 1, 2008, Citrin entered into an asset management agreement with Millennium which tied together every project under Cargo Investors and Cargo Investors II, plus Bronstein and MMT, meaning there would be no payment to Citrin Holdings and Cullen 130 on their carried interests until

9

every property in the portfolio had been sold.  Citrin insisted that this agreement did not change any arrangement, but only clarified the arrangement that had always existed.

Minnis also complains that Cullen 130 did not receive its share of the proceeds of the post-dissolution sale of one of the properties in which it had an interest.  CV 96th Street, LLC purchased the 96th Street property in June 2006 for $8.5 million when Minnis and Citrin were in business together.  Efforts to find tenants after renovations were unsuccessful, but CV 96th Street sold the property in 2007 for $13.1 million to a company that wanted the property because it was located on a natural gas pipeline.  Cargo Investors had the carried interest, but did not receive any of the profit on the sale because, as Citrin explained, that went to pay the equity and preference in the overall portfolio.  Citrin gave Minnis no notice before selling the property.

## F.  Failure to Liquidate the Cargo Entities

One of Minnis's primary complaints in this lawsuit is that Citrin did not liquidate or distribute the assets upon dissolving the Cargo Entities as required by the three Cargo Entities' operating agreements.  The agreements required, upon dissolution, the appointment of a liquidator "to wind up the affairs of the Company, liquidate the property and assets of the Company, and terminate the Company."[7]  After paying liquidation expenses and debts and liabilities, and establishing a reserve deemed necessary for contingent or unforeseen liabilities or obligations, the proceeds of the liquidation were to be paid to the "Members, pro-

---

[7] Section 11.2 of the operating agreements for Cargo Ventures New York and Cargo Investors provided that "the Members shall unanimously appoint a Person (which could be the Manager or another Person as liquidator."  The Cargo Investors II operating agreement provided that "the holder or holders of a majority of the Sharing Ratios shall appoint a Person (which could be the Manager or another Person) as liquidator."

rata in proportion to their respective Sharing Ratios." Furthermore, "if the Manager shall determine not to liquidate the property and assets of the Company because a complete liquidation of all the property and assets of the Company would involve substantial losses or be impractical under the circumstances or for any other reason or for no given reason, the Manager shall liquidate that portion of the assets of the Company sufficient to pay the expenses of liquidation and the debts and liabilities of the Company . . . and the remaining assets shall be distributed to the Member as tenants-in-common or partitioned."

Citrin testified that this lawsuit prevented him from taking any steps to have the assets appraised or liquidated because it is a contingent liability against the Cargo Entities. Therefore, Citrin claimed that, even if he had liquidated certain assets for cash, "Every penny would have stayed in the company until the lawsuit was resolved." Minnis points out that, even though Citrin claimed that he was unable to wind up the companies, he was able to sell a property like CV 96th Street, as described above.

## G. Decline in the Value of the Portfolio

Minnis further complains that Citrin did not sell the property when there was opportunity to do so. According to Minnis, "there was so much money in the market chasing deals that people — brokers were just saying, 'Your bids are due this day; may the best man win.' And you'd get 10, 15, 20 offers." Minnis testified that, when he was removed as president of Cargo Ventures New York in December 2006, "if you could pick a peak in the market, that was the peak. That was as good as it got." Moreover, according to Minnis, "there was not a better time to be a seller in the real estate market, since [he had] been in the business." The market started to decline later in 2007, and the value of the assets "went down." As previously mentioned, Citrin did not want to sell when a Millennium

11

investment committee member asked him, in December 2006, why they were not selling properties in the portfolio.

Moreover, Morgan Stanley offered to buy four properties in the portfolio for $131 million in late 2007. Citrin testified that Morgan Stanley offered to purchase some of the properties in the portfolio. Citrin stated that he was "intimately involved" in the negotiations with Morgan Stanley. Citrin testified that Millennium rejected the offer and "ultimately decided not to sell because the offer was too low." Citrin believed that it made sense to accept the Morgan Stanley offer, "but it wasn't his ultimate decision." Citrin testified Morgan Stanley's offer would not have provided enough recovery of the invested equity and outstanding debt to cover the preferred return and pay the carried interests. Citrin explained that "Millennium would have been able to achieve a profit, but certainly not enough for the carried interests to be in the money." Minnis had no part in deciding whether to accept Morgan Stanley's offer.

## H. The Minnis Parties' Claims

As mentioned above, on December 13, 2006, Cullen 130 initially sued Citrin, Citrin Holdings, and the Cargo Entities for fraud and negligent misrepresentation, and requested an accounting. Later, Cullen 130 sued Citrin and Citrin Holdings, individually and derivatively on behalf of the three Cargo Entities, naming the Cargo Entities as nominal defendants. Minnis also became a plaintiff in the suit.

In their fifth amended petition—the live pleading at trial—Minnis and Cullen 130, individually and derivatively on behalf of the Cargo Entities, brought causes of action for fraud, breach of the operating agreements, breach of the partnership agreement, breach of fiduciary duty, negligent misrepresentation, majority oppression, conspiracy, knowing participation/aiding and abetting breach

12

of fiduciary duty, and a request for an accounting.  The Minnis Parties sought the value of the carried interests as of March 2007.

## II. JURY VERDICT & JUDGMENT

The case was tried to a jury, which found for Minnis, Cullen 130, or both on each cause of action submitted as follows:

- Citrin and Citrin Holdings breached their fiduciary duties owed to Cullen 130;
- Citrin Holdings engaged in oppressive conduct against Cullen 130;
- Citrin and Citrin Holdings breached the operating agreements;
- Minnis and Citrin agreed to form a partnership;
- Citrin breached the partnership agreement with Minnis;
- Citrin breached the duties of loyalty and care owed to Minnis;
- "Citrin and Citrin Holdings engage[d] in fraud against Minnis and Cullen 130";
- Citrin and Citrin Holdings conspired to breach fiduciary duties owed to Cullen 130;
- Citrin and Citrin Holdings aided and abetted a breach of fiduciary duties owed to Cullen 130; and
- By clear and convincing evidence, harm "to Minnis and/or Cullen 130" resulted from malice or fraud in connection with the claims for breach of fiduciary duty and fraud.

The jury found actual damages in the amount of $28,231,871 for each cause of action, out-of-pocket damages in the amount of $1,023,000 on the fraud claims, and $14,154,000 in exemplary damages.

13

The parties agreed to try the claim for attorney's fee to the trial court. The trial court found that Minnis and Cullen 130 incurred reasonable and necessary attorney's fees of $1,807,515.95 through September 10, 2010, and $67,232.00 from October 1, 2010, through entry of final judgment, and defense of the judgment on appeal would require plaintiffs to incur reasonable and necessary attorney's fees of $250,000 if an appeal is filed in the court of appeals; $27,000 if petition for review is filed in the Texas Supreme Court; $80,000 if the Texas Supreme Court requests full briefing; and $25,000 if the Texas Supreme Court grants such petition for review and request oral argument.

On April 27, 2011, the trial court signed the final judgment and awarded the following:

- $28,231,871 in actual damages to Cullen 130 on its breach of fiduciary duty claim, with Citrin and Citrin Holdings jointly and severally liable;

- $14,154,000 in exemplary damages to Cullen 130, with recovery from Citrin;

- $10,351,428 in prejudgment interest to Cullen 130, with Citrin and Citrin Holdings jointly and severally liable;

- $1,808,515,95 in attorney's fees through September 10, 2010, and $67,232 from October 1, 2010, through entry of final judgment to Cullen 130, with recovery from Citrin and Citrin Holdings;

- $250,000 in attorney's fees if an appeal is filed in the court of appeals, $27,000 if a petition for review is filed in the Texas Supreme Court, $80,000 if the Texas Supreme Court requests full briefing on the merits, and $25,000 if the Texas Supreme Court grants such petition and requests oral argument; such award of appellate attorney's fees to Minnis and

14

Cullen 130, with Citrin and Citrin Holdings jointly and severally liable, is conditioned on the successful defense of any appeal; and

- post-judgment interest at the rate of 9% per annum, to Cullen 130, with Citrin and Citrin Holdings jointly and severally liable.

The trial court's judgment stated that, "should Cullen 130's recovery for breach of fiduciary duty become less favorable for any reason, the Plaintiffs" may recover on any one of the other theories found by the jury.

The Citrin Parties challenge the trial court's judgment in favor of Cullen 130 on its breach of fiduciary duty claim.[8] In conditional cross-points, the Minnis Parties contend that if we reverse the judgment on the breach of fiduciary duty claim, we can affirm the trial court's judgment on any of their alternative claims.[9]

### III. EXPERT TESTIMONY

Because it applies to all of the Minnis Parties' claims, we will first address the Citrin Parties' second issue. The Citrin Parties argue that the trial court erred

---

[8] Citrin and Citrin Holdings filed separate opening briefs as appellants, each adopting the other's arguments. Citrin's brief specifically addresses the judgment awarded on Cullen 130's breach of fiduciary duty claim. As to the actual judgment on Cullen 130's recovery on its breach of fiduciary duty claim, the Citrin Parties bring the following issues: (1) the evidence is legally and factually insufficient to support the finding of $28,231,871 in actual damages; (2) the trial court erred in overruling appellant's reliability challenge of the Minnis Parties' damages expert; (3) the judgment impermissibly treats the breach of fiduciary duty claims as direct claims instead of derivative claims; (4) the trial court erred in admitting evidence of witnesses who testified about matters unrelated to the partnership claims; and (5) the trial court erred in awarding exemplary damages, attorney's fees, and post-judgment interest. The Citrin Parties aver that their first and second issues—sufficiency of the evidence supporting actual damages and reliability of the damages expert's testimony—apply not only to Cullen 130's breach of fiduciary duty, but to all of the Minnis Parties' alternative claims. Therefore, according to the Citrin Parties, their first or second issues are independently dispositive of all matters except the out-of-pocket damages found by the jury on the Minnis Parties' fraud claims.

[9] In its opening brief, Citrin Holdings preemptively challenges the trial court's alternative judgment as it relates to the Minnis Parties' claims for fraud, breach of partnership duties, minority oppression, breach of contract, and conspiracy to, and/or aiding and abetting, breach of fiduciary duties.

in overruling their challenge to the testimony of the Minnis Parties' damages expert, Scott Bayley. The Minnis Parties retained Bayley to determine the value of Cullen 130's interest in the Cargo Entities as of March 2007, when Citrin dissolved the Cargo Entities. The Citrin Parties filed a motion to exclude Bayley's testimony on grounds that it is unreliable under *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and *E. I. DuPont de Nemours v. Robinson*, 923 S.W.2d 549 (Tex. 1995). After conducting a hearing, the trial court denied the Citrin Parties' motion.

## A. Standard of Review

Texas Rule of Evidence 702 governs the admissibility of expert testimony.[10] Expert testimony is admissible if (1) the expert is qualified and (2) the testimony is relevant and based on a reliable foundation. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006).

Once the party opposing the evidence objects, the proponent of the expert testimony has the burden to prove that the evidence is admissible. *Robinson*, 923 S.W.2d at 557. The trial court makes the initial determination about whether the expert and the proffered testimony meet the requirements for admissibility. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). "When expert testimony is involved, courts are to rigorously examine the validity of facts and assumptions on which the testimony is based, as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the

---

[10] Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702.

principles and methodologies are applied by the expert to reach the conclusions." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009).

The Citrin Parties do not challenge Bayley's qualifications as an expert or contend that his testimony is irrelevant. They urge that his testimony is unreliable. "Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under Rule 702." *Robinson*, 923 S.W.2d at 557. In determining whether expert testimony is reliable, a court may consider the non-exclusive factors set forth in *Robinson*.[11] *Whirlpool Corp.*, 298 S.W.3d at 638. The *Robinson* factors may not apply when testimony is not scientific, but, rather, involves technical or other specialized knowledge. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006) (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998)). However, there must still be some basis for the opinion offered to show its reliability, and the trial court must determine how to assess reliability. *Helena Chem. Co.*, 47 S.W.3d at 499 (citing *Gammill*, 972 S.W.2d at 726). There cannot be "'too great an analytical gap between the data and the opinion proffered.'" *Gammill*, 972 S.W.2d at 726 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

An expert's opinion is unreliable if it is based on assumed facts that vary from the actual facts. *Whirlpool Corp.*, 298 S.W.3d at 637; *see also Helena Chem. Co.*, 47 S.W.3d at 499 ("If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable."). In that case, the opinion is

---

[11] *Robinson* listed the following six non-exclusive factors for the court to consider when determining whether expert testimony is reliable: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. 923 S.W.2d at 557.

not probative evidence and cannot support the verdict or judgment. *Whirlpool Corp.*, 298 S.W.3d at 637; *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995).

The court's ultimate task is not to determine whether the expert's conclusions are correct, but rather whether the analysis the expert used to reach those conclusions is reliable and therefore admissible. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239 (Tex. 2010). A trial court's ruling on objections as to admissibility of evidence, including whether expert testimony is reliable, is reviewed for abuse of discretion. *Whirlpool Corp.*, 298 S.W.3d at 638.

## B. Expert's Testimony

Adopting certain figures from a Cargo Ventures investor summary schedule prepared by Cargo Ventures senior analyst Kim Aboulhosn, which was provided to the Millennium investment committee, Bayley undertook to determine the value of Cullen 130's interest in the Cargo Entities' income-producing properties as of March 2007 under the "direct capitalization" method. This methodology, not itself challenged by the Citrin Parties, involves determining the income a property will produce when it reaches a stable level of operation. The expected income is known as the "stabilized income" of the business. The stabilized income for a real estate project is when its operations are considered stable, which may be when the project is 95% to 100% leased-up.

Bayley then applied a "capitalization rate" or "cap rate," which is a ratio representing the relationship of net operating income to value. The cap rate can change over time based on market conditions. It "is based on how much risk you're willing to take and what are your alternatives for investing the money that you might have." Business journals contain information about what cap rates are utilized for certain types of properties. Dividing the net operating income by the

18

cap rate yields the "stabilized value" of the property.

If a property was not fully leased, i.e., an "unstabilized property," Bayley used the same methodology with adjustments to determine the stabilized value. Bayley computed the stabilized net operating income, which is how much income will be generated on a stabilized basis in one year. Bayley calculated the lost rental income that will not be received during the period of achieving stabilization. Bayley subtracted the lost rental income from the stabilized value. Bayley also subtracted additional costs required to get to stabilization, such as making improvements to the property and costs for leasing and advertising. The result is the "as-is value" or "present value."

Using the direct capitalization method for both stabilized properties and unstabilized properties, for which he considered costs in reaching stabilization, Bayley determined that the value of Cullen 130's interest in all the properties was $28,231,871 as of March 2007.[12] Bayley also stated that he accounted for debt to lenders and Millennium's equity and preferred return.

As previously stated, the Citrin Parties do not complain about Bayley's use of the direct capitalization method. Instead, they complain that Bayley's testimony applying the methodology was unreliable because he (1) used Cargo Ventures' internal projections; and (2) arbitrarily stopped the running of interest on the preferred return as of March 2007.

---

[12] Bayley specifically determined the value of each property as follows: McClellan, $1,838,626; MP Cargo LAX, $1,985,303; Cove portfolio, $546,289; ICCNE, $1,128,168; 96th Street, $389,873; 74th Street, $5,167,224; CV Miami, $1,237,485; Bronstein, $10,186,678; and MMT, $5,751,811.

## C. Internal Projections

The Citrin Parties complain that Bayley treated Cargo Ventures'[13] internal future projections for undeveloped properties as current values of developed properties.[14] Bayley adopted the cap rate, net operating income, and stabilized values from the investor summary schedule for the first quarter of 2007. Bayley used those figures because he "was able to confirm that Cargo Ventures was doing the methodology the same way that I would do it."

Kim Aboulhosn of Cargo Ventures testified that she prepared the schedule to "give us an idea . . . [of] what Cargo Ventures' interest would be at some point in the future." Aboulhosn never intended for the analysis to reflect the "as-is" value as of the date of the analysis, and testified that it is a mischaracterization to label it as such. Aboulhosn used the cap rate, which was determined by Citrin, along with information from other employees. Aboulhosn stated the models she prepared went to Millennium. She explained that parts of the models also went to lenders as a request for financing, but the lenders never used Cargo Ventures' numbers to value a property; instead, the lenders chose to have an appraisal done. Aboulhosn stated she is not a valuation expert.

At the *Daubert* hearing, Bayley testified, with regard to Aboulhosn's statement that her calculations do not provide the present value of the properties, that Aboulhosn was "a little confused in her answer" and "a little confused about what she's doing." Therefore, Bayley said he was "rejecting" Aboulhosn's

---

[13] We do not attempt to differentiate between Cargo Ventures New York and Cargo Ventures Delaware here because neither Bayley nor the parties have specified the Cargo Ventures entity to which they are referring.

[14] The Minnis Parties contend that the Citrin Parties waived this argument by not raising it in the trial court. However, a review of the Citrin Parties' motion to exclude reflects that they raised this argument in their motion. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004).

testimony as to what the values she prepared actually represented.

Mark Pasquerella, comptroller of Cargo Ventures (New York and Delaware), explained that Citrin told Aboulhosn how to model the portfolios and, therefore, the models are "really a Jake Citrin financial model." Pasquerella testified that the financial models were provided to Millennium, lenders, and potential buyers. According to Pasquerella, the financial models were Citrin's "very best view at the time before litigation of what these portfolios are worth." Chris Jeffries testified that the models should be as accurate as possible so that Millennium and its institutional partners can "evaluate the success of what we're doing by looking at financial results, historical and financial projections expected."

Courts allow expert testimony based on internal projections or valuations when it is shown that they are reliable.[15] However, expert testimony based on internal projections or valuations is not admissible when there is no evidence that the data is reliable.[16] The Minnis Parties assert that the Citrin Parties cannot now

---

[15] *See, e.g.*, *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 771–72 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding the trial court did not err in its reliability finding where the appellee's damages expert's methodology incorporated assumption supported by the appellants' own evidence and an independent third-party finding).

[16] *See, e.g.*, *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (affirming exclusion of expert's testimony because the appellee's internal projections "rested on its say-so" rather than statistical analysis; projections "represented hopes rather than the results of scientific analysis"); *Victory Records, Inc. v. Virgin Records Am., Inc.*, No. 08 C 3977, 2011 WL 382743, at *2 (N.D. Ill. Feb. 3, 2011) (excluding expert testimony because assumption that internal sales projections were correct was not reliable where the expert offered no basis in his expert report for concluding that internal projections provided an acceptable foundation for an expert's opinion in his field); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 887–88 (E.D. Wis. 2010) (excluding expert testimony as unreliable where expert adopted data whole sale from a PowerPoint slide stating the company's hopes for how many units would be on the market; there was no indication that the underlying data on which the expert relied were "anything more than a hopeful projection, a far cry from being 'reliable sources of information' that an expert can rely on in forming an opinion"); *Heller v. Am. Indus. Props. REIT*, 156 F. Supp. 2d 645, 650 (W.D. Tex. 2000) (holding expert's testimony was unreliable because he relied in part on certain internal valuations made prior to and during course of merger negotiations which the court found carried no indicia of reliability; there was no evidence in the

21

claim Cargo Ventures' internal projections are unreliable when the Citrin parties themselves provided those projections to Millennium and other lenders to secure financing. *See Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 332 (Del. Ch. 2006) ("Traditionally, this court has given great weight to projections of this kind because they usually reflect the best judgment of management, unbiased by litigation incentives. That is especially so when management provides estimates to a financing source and is expected by that source (and sometimes by positive law) to provide a reasonable best estimate of future results. Therefore we have regarded with rightful suspicion attempts by parties who produced such projections to later disclaim their reliability, when that denial serves their litigation objective."). We agree that an effort by the Citrin Parties to discredit or disclaim their own Cargo Ventures' projections would lack credibility, if those projections are otherwise reliable.

Here, however, the Minnis Parties have not established that the numbers Bayley adopted from the Cargo Ventures investor summary schedule are reliable. That they are Cargo Ventures' internal figures is not, standing alone, evidence of reliability. There has been no showing that the stabilized values Cargo Ventures placed on the properties were anything more than its hopes for what the property would be worth in the future.[17] Such hopes do not establish a reliable damages model. *See Zenith Elecs. Corp.*, 395 F.3d at 420 (affirming exclusion of expert's

---

record that the figures were anything more than negotiating tools in the merger, which seriously undermined their objectivity and thus their reliability; plaintiffs offered no support for assumption that a real estate expert may, as a method of appraisal, simply borrow figures arrived at after an unexamined, untested, arguably biased internal valuation process).

[17] The Citrin Parties cite Bronstein as the most telling example of Bayley's reliance on unreliable internal projections. The Citrin Parties purchased Bronstein in January 2007 for approximately $38 million, but Bayley used a stabilized value of approximately $113 million, subtracting $30 million in costs to reach stabilization to conclude that Bronstein's present value in March 2007 was $83 million.

testimony based on internal projections because projections, among other things, "represented hopes rather than the results of scientific analysis"); *Fail-Safe, L.L.C.*, 744 F. Supp. 2d at 887–88 (excluding expert testimony as unreliable where the underlying internal data on which the expert relied were "anything more than a hopeful projection, a far cry from being 'reliable sources of information' that an expert can rely on in forming an opinion"). Cargo Ventures was entitled to "create speculative, optimistic, and conjectural projections and to rely on them in making business decisions." *Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 822–23 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). The fact that Cargo Ventures created projections reflecting values it would like for the properties to have in the future does not make such projections evidence that the Minnis Parties can use to support a damage award against the Citrin Parties.

Moreover, as addressed above, Bayley rejected Aboulhosn's testimony that her calculations did not provide the present value of the properties because he believed that she was "confused" about their purpose. In essence, Bayley challenged Aboulhosn's competence to create the projections.

The Citrin Parties further complain of Bayley's valuation of the MMT project as of March 2007 because it is undisputed that the Citrin Parties had no rights to develop MMT until April 27, 2007. Specifically, the Citrin Parties contend that Bayley's opinion testimony is unreliable because his assumption that the Citrin Parties and Millennium had development rights to MMT in March 2007 varies from the actual facts of the case. *See Whirlpool Corp.*, 298 S.W.3d at 637; *Burroughs Wellcome Co.*, 907 S.W.2d at 499.

Bayley explained that he "believe[d] as of March of '07 it was pretty clear that they were going to be closing into that and getting those rights. . . . [T]his was the culmination of a very long effort." The Minnis Parties contend that Bayley's

23

assumption is supported by evidence that Cargo Ventures had spent several years and millions of dollars pursuing development rights to MMT, Cargo Ventures was negotiating with future tenants, and Cargo Ventures had financing in place with Millennium. They assert that Bayley provided a sound basis for his assumptions and it was for the jury to decide the weight to be given to his testimony. In making this argument they rely on *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. National Development & Research Corp.*, citing it for the proposition that an expert's testimony is reliable where he provides a reasonable explanation for his assumptions. 232 S.W.3d 883 (Tex. App.—Dallas 2007), *rev'd on other grounds by* 299 S.W.3d 106 (Tex. 2009).

In that case, Akin Gump's own expert agreed with NDR's expert's assumptions. *Id.* at 891. Akin Gump's expert testified that he would have performed calculations under a different methodology, which the court held did not make the challenged calculations unreliable. *Id.* at 891–92.[18] Here, in contrast, the Citrin Parties do not agree that Bayley's assumptions are reasonable because they did not have development rights to MMT in March 2007. Therefore, *Akin, Gump* does not control.[19]

With respect to the Minnis Parties' assertion that it was for the jury to decide the weight to be given to Bayley's testimony, it is the trial court's sole responsibility to determine whether the expert's testimony meets the requirements

---

[18] The undisputed evidence at trial also showed that Citrin and Millennium's rights to develop MMT were to expire at the end of 2010 because construction had not started, and they were seeking an extension of their rights.

[19] The cases cited in *Akin, Gump* do not support the Minnis Parties' position. *See Nip*, 154 S.W.3d at 772 (holding testimony of the appellee's expert was reliable because the appellant's own evidence supported expert's assumption); *United Servs. Auto. Ass'n v. Pigott*, 154 S.W.3d 625, 631–32 (Tex. App.—San Antonio 2003, no pet.) (holding difference in interpretation of soil samples among experts did not amount an analytical gap because the trial court could have determined the analysis expert used was reliable given the conflicting testimony).

for admissibility. *Helena Chem. Co.*, 47 S.W.3d at 499; *see also Whirlpool Corp.*, 298 S.W.3d at 637 ("When expert testimony is involved, courts are to rigorously examine the validity of facts and assumptions on which the testimony is based, as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the principles and methodologies are applied by the expert to reach the conclusions."). While Bayley assumed that Cargo Ventures would obtain the rights to MMT, there was no guarantee that would happen and, therefore, his assumption was based on speculation. We conclude that because Bayley's testimony rested upon the assumption that Cargo Ventures had rights to develop MMT in March 2007—an assumption which is contrary to undisputed facts—his testimony was unreliable and inadmissible.

The Minnis Parties further respond that evidence independent of Bayley's analysis supports his conclusions. In November 2007, Morgan Stanley sent Citrin a letter of intent offering to purchase four of the properties in the Cargo Entities portfolio for $131 million—an offer Millennium ultimately did not accept because it was too low. The Minnis Parties state Morgan Stanley valued (1) a portion of the Cove portfolio for $23 million, while Bayley valued the entire Cove portfolio at $22.9 million; and (2) the "LAX Exchange" for $70 million, while Bayley valued it at $65 million.

The Minnis Parties' reliance on Morgan Stanley's letter of intent is misplaced because this evidence, too, is unreliable and insufficient to support the damages award. First, Morgan Stanley's valuation was dated eight months after the March 2007 dissolution. Second, Morgan Stanley was not valuing the entire Cargo Entities' portfolio, including Bronstein and MMT, but only a limited portion of the overall portfolio. Therefore, based on these infirmities, the values Morgan Stanley placed on a limited portion of the Cargo Entities' portfolio eight months

25

after March 2007 is not reliable and, therefore, cannot support the amount of the damage award.

The Minnis Parties also rely on Opus's valuation of three of the Cargo Entities' projects at $8 million in September 2005. The Minnis Parties' reliance on Opus's offer suffers from the same problems as their reliance on the Morgan Stanley offer. It is dated eighteen months earlier than the March 2007 dissolution of the Cargo Entities, and it covers only a small portion of the portfolio that the Cargo Entities would acquire. Even if we consider this as some evidence of value, it is not tied in any way to the damages Minnis alleged.

The Minnis Parties further rely on other internal valuations of Minnis's interest or the Cargo Entities' interest to support the $28,231,871 award. However, the Minnis Parties have not shown that the figures were reliable, i.e., not speculative. Specifically, the Minnis Parties cite to a September 2006 document showing that Minnis's interest in the properties was valued at $37 million. Minnis testified that $37 million was the value of his interest as of September 2006, and he and Citrin had "multiple discussions" about that fact. However, the document included that MMT opportunity, which was not closed until April 2007, seven months later.

The Minnis Parties also cite to the first page of a document showing Cullen 130's purported value in the Cargo Entities after Citrin had taken Bronstein and MMT. It reflects that only Citrin has an interest in Bronstein and MMT. It shows that the value of Cullen 130's interest in the Cargo Entities, without any interest in Bronstein and MMT, was $12,810,610. Bayley valued Cullen 130's interest in the Cargo Entities at $12,278,000, without including the value of Bronstein and MMT. Aboulhosn did not create, or know who prepared, that page, and Citrin could only speculate on who prepared that page. It is not dated, and it was not known when it

26

was prepared.

The Minnis Parties further cite to projections prepared by Aboulhosn in May 2007. However, as before, Aboulhosn explained that the portfolio values were not a value as of any particular date. Therefore, those projections are not reliable or sufficient to support the damages award.

In summary, we conclude that the Bayley opinion cannot rest upon unreliable internal projections as a reliable basis for the award of damages. Further, the Minnis Parties are unable to cobble together any other reliable evidence to sustain an award of $28,231,871.

## D. Millennium's Preferred Return

The Citrin Parties also complain that Bayley did not account for the accrual of Millennium's preferred return when he cut off the accrual of the return as of March 2007.[20] The Citrin Parties point out that Bayley testified at the *Daubert* hearing that he recognized different properties were expected to stabilize at different points in time in the future by not assuming that the property would be fully leased, and by taking into account costs incurred in reaching stabilization. Bayley testified in front of the jury that he subtracted rental income that would not be received until the property was stabilized and costs incurred in reaching stabilization. However, the facts show that only when the properties sell and the proceeds are applied to the preferred return that the interest will stop accruing. It is

---

[20] The Minnis Parties assert that the Citrin Parties waived this issue by not raising it in the trial court. As addressed below, cutting off the interest on the preferred return is contrary to the undisputed facts that the terms of the operating agreements required the compounding of the preferred return, and preferred return continues to accrue until the property is sold. The Citrin Parties raised no evidence points in the trial court after the verdict in their (1) opposition to the Minnis Parties' motion for judgment; (2) motion for new trial, and motion to modify, correct, or reform; and (3) motion for judgment notwithstanding the verdict. Challenges to expert testimony that is non-probative on its face may be raised in the absence of any objection to its admissibility. *Coastal Transp. Co.*, 136 S.W.3d at 233.

undisputed that Citrin and Millennium did not sell the portfolio in March 2007. Therefore, the preferred return continued to compound after March 2007.

Because Bayley's cutting off the accrual of the preferred return as of March 2007 contradicts known facts, his opinion is not probative evidence of Cullen 130's or Minnis's damages. *See Whirlpool Corp.*, 298 S.W.3d at 637; *Burroughs Wellcome Co.*, 907 S.W.2d at 499. The trial court abused its discretion in admitting Bayley's expert opinion. We sustain the Citrin Parties' second issue.

Because we have sustained the Citrin Parties' second issue, Cullen 130 may not recover the $28,231,871 award on its breach of fiduciary duty claim. Moreover, Bayley's testimony formed the foundation for the $28,231,871 damage model on all other theories of liability. Because the trial court erred in finding Bayley's expert testimony reliable, neither Cullen 130 nor Minnis may recover the $28,231,871 awarded on any of their claims in the trial court's alternative judgment.

The trial court also awarded the Minnis Parties $1,023,000 in out-of-pocket damages on their alternative claim for fraud and/or fraudulent inducement. We therefore turn to analysis of the fraud and/or fraudulent inducement claim. As addressed below, there is no evidence of fraud.

## IV. FRAUD

In their sixth issue, the Citrin Parties assert that there is no evidence of fraud.[21] In their first conditional cross-point, the Minnis Parties contend that the trial court properly entered the alternative judgment on their fraud claims. The

---

[21] Citrin Holdings challenges the Minnis Parties' alternative claims in its opening brief. It addresses the fraud claims in its first issue. However, because Citrin and Citrin Holding adopt the issues and arguments raised in each other's briefs, we will refer the issue on the fraud claims as the "sixth" issue for the sake of simplicity and clarity.

Minnis Parties' fraud claims are based on (1) Citrin's having fraudulently induced Minnis into entering an oral partnership with Citrin; and (2) Citrin Holdings' having fraudulently induced Cullen 130 into entering the Cargo Entities operating agreements with Citrin Holdings.

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We may not sustain a legal sufficiency, or "no evidence" point unless the record demonstrates: (1) a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810.

The elements of fraud are (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Aquaplex, Inc. v. Rancho la Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam).

"Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). Fraudulent inducement is a "particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). The plaintiff must

29

establish the elements of fraud as they relate to an agreement between the parties. *Id.* at 798–99. Without a binding agreement, there is no detrimental reliance, and thus, no claim for fraudulent inducement. *Id.* at 798.[22] In other words, when a party has not incurred a contractual obligation, it has not been induced to do anything. *Id.*

## A. The Minnis/Citrin Partnership

We first determine, therefore, whether the Minnis/Citrin Partnership provides a binding agreement. The parties urge competing theories of analysis. The Citrin Parties advance a contract-based analysis. Specifically, they contend that the alleged oral partnership agreement between Minnis and Citrin is too indefinite to be enforced. By contrast, the Minnis Parties counter that contract principles do not apply when determining whether a partnership was formed; instead, courts consider the statutory factors found in the Texas Revised Partnership Act ("TRPA").[23] We conclude, as outlined below, that we need not determine which of the parties' theories is more appropriate because the

---

[22] The specific issue in *Haase* was whether a party can maintain a claim based on fraud or fraudulent inducement when that claim is premised on a contract that the statute of frauds makes unenforceable. 62 S.W.3d at 796. The court held that the statute of frauds bars a fraud claim to the extent that the plaintiff seeks to recover benefit-of-the-bargain damages, but it did not bar out-of-pocket damages because the plaintiff was not attempting to enforce the otherwise unenforceable agreement. *Id.* at 799. Here, we are not deciding whether the purported oral overarching partnership is unenforceable based on the statute of frauds. Instead, we are deciding that the parties did not create a partnership and, therefore, *Haase*'s holding that out-of-pocket damages can be recovered when the statute of frauds bars enforcement of an oral contract is not applicable to this case.

[23] The TRPA governed partnerships formed on or after January 1, 1994, and other existing partnerships that elected to be governed by it. *Ingram v. Deere*, 288 S.W.3d 886, 894 n.4 (Tex. 2009). In 2003, the Texas Business Organizations Code replaced the TRPA. *Id.* The Business Organizations Code governs partnerships formed on or after January 1, 2006, and other partnerships that elect to be governed by the Business Organizations Code. *Id.* The TPRA expired on January 1, 2010; after that, the Business Organizations Code governs all existing partnership, regardless of their formation date. *Id.* The TRPA and the Business Organizations Code's rules for determining partnership formation are substantially the same. *Id.*

Minnis/Citrin Partnership does not survive either analysis.

The Citrin Parties rest their contract-based analysis upon *Knowles v. Wright*, 288 S.W.3d 136 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). In *Knowles*, the appellants alleged claims for breach of an oral contract and breach of fiduciary duty based on an oral partnership agreement. *Id.* at 140. The appellants alleged with respect to both claims that the appellee had failed to share one-half of the business in exchange for Knowles's idea and consulting services. *Id.* The appellate court affirmed the summary judgment on the breach of contract claim on the basis that it was too indefinite to be enforced. *Id.* at 144. The appellate court also affirmed the summary judgment on breach of fiduciary duty. *Id*. at 146–47. In holding "that the record establishes as a matter of law the lack of the existence of a partnership," the court again noted that the terms of the agreement were too indefinite to enforce any agreement between the parties.[24] In support of their TRPA factors position, the Minnis Parties rely on *Sewing v. Bowman*, which rejected the argument that a party must prove the elements of a valid contract in order to establish a partnership. 371 S.W.3d 321, 331–32 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd). Instead, partnership formation is determined by application of TRPA factors. *Id.* at 332.

As previously mentioned, we do not need to determine which of our sister court's opinions is more analogous. Whether we apply contract principles as *Knowles* suggests or TRPA factors as *Sewing* suggests, we conclude, as addressed below, that there was no partnership agreement between Minnis and Cullen and, therefore, Minnis's fraudulent inducement claim fails.

---

[24] The Minnis Parties correctly note that the *Knowles* court also analyzed the partnership under the TRPA factors. *See* 288 S.W.3d at 146–47. As such, it is unclear that *Knowles* establishes a separate contract-based theory for determining the existence of a partnership.

## 1. Indefinite Contract Terms

A contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). The terms of an oral contract must be definite, certain, and clear as to all essential terms, and if they are not, the oral contract fails for indefiniteness. *Southern v. Goetting*, 353 S.W.3d 295, 299–300 (Tex. App.—El Paso 2011, pet. denied). "[E]ssential or material terms are those that parties would reasonably regard as vitally important elements of their bargain." *Heartland Holdings, Inc. v. U.S. Trust Co. of Tex., N.A.*, 316 S.W.3d 1, 9 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (internal quotations and citations omitted). When essential terms are missing, we may find no more than an agreement to agree. *Fiduciary Fin. Servs. of the Sw., Inc. v. Corilant Fin., L.P.*, 376 S.W.3d 253, 256 (Tex. App.—Dallas 2012, pet. denied). Although Texas courts favor validating contracts, we may not create one where none exists. *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex. App.—Dallas 2007, no pet.). Whether an agreement fails for indefiniteness is a question of law for the court. *Argo Data Res. Corp. v. Shagrithaya*, 380 S.W.3d 249, 274 (Tex. App.—Dallas 2012, pet. filed) (citing *Knowles*, 288 S.W.3d at 143).

Minnis claimed that he and Citrin orally agreed that they were going to be partners. Minnis could not identify when the partnership was orally created: "We talked about it a bunch. I'm not sure the exact day when we shook hands and said we've got a deal. That was the day for me." Minnis later stated they created the partnership during the time between the purchase of McClellan 160 and the closing of the Cove portfolio and the Lowe opportunity. According to Minnis, they were going to buy and develop airport industrial real estate, lease it, and manage it in

this overarching partnership. Minnis testified: "I think we shook hands on it and said we've got a deal, and that was enough for me."

Subsequent to the purported oral partnership agreement, Minnis and Citrin signed a piece of paper, which said, "We are partners. Jake Citrin, Matt Minnis, 45% and 55%." Minnis explained, "We shook hands and had agreed to terms and I think that signing the piece of paper was an affirmation of that." Under the terms of the partnership, they would split "55/45 . . . [o]f any dollar that came in the door." For Minnis, "[i]t was pretty simple." The piece of paper does not state what business they were going to be in. But, "[i]t described the only terms [Minnis] needed." Minnis wanted that signed agreement in case something happened to Citrin, and he intended for that agreement to be binding.

According to Minnis, this purported overarching partnership "gave birth" to the Cargo Entities operating agreements. Minnis explained that even though they had the overarching partnership agreement, it was necessary to set up the different entities because "[o]nce you agree you're going to be partners, I think it's important to be specific." The different entities were also necessary because, as Minnis testified, "I think that it's something that the lenders are going to require. It's something that I'm sure Millennium would require."

Minnis explained that there is nothing about the overarching partnership in his tax returns because that is not how they reported income. Minnis stated that he had not seen a filed tax return for the overarching partnership, and further explained that there were no tax returns for the overarching partnership "[b]ecause that was a handshake deal and an agreement on what our terms were going to be." Citrin testified that Mark Pasquerella, the comptroller of Cargo Ventures New York and Delaware, did not keep books and records for a separate partnership between Citrin and Minnis.

The terms are not sufficiently definite or certain for a court to identify the parties' obligations. Minnis acknowledged that they needed the specifics of the Cargo Entities operating agreements even though the "simple" terms of the handshake deal were enough for him. Minnis testified that they would split "55/45 . . . [o]f any dollar that came in the door," but there are no tax returns or books and records for the partnership to verify this.

We conclude that the oral overarching partnership agreement is not definite enough to be enforced. *See Knowles*, 288 S.W.3d at 144–46 (holding that an oral agreement failed for indefiniteness where the appellants did not offer evidence of obligations or specific services owing under the agreement and did not address how shares were to be paid or costs calculated); *Lamajak*, 230 S.W.3d at 794 (holding no enforceable oral contract existed where there was no evidence what services would be rendered in exchange for share of gross profits)

## 2. Statutory Factors

The TRPA sets forth the following five factors indicating the creation of a partnership: (1) receipt or right to receive a share of profits of the business; (2) expression of intent to be partners in the business; (3) participation or right to participate in control of the business; (4) sharing or agreeing to share losses and liabilities of the business; and (5) contributing or agreeing to contribute money or property to the business.[25] The TRPA "does not require proof of *all* the listed factors in order for a partnership to exist." *Ingram*, 288 S.W.3d at 896. We determine whether a partnership exists by looking at the "totality of the circumstances" and considering "all of the evidence bearing on the TRPA partnership factors." *Id.* An absence of any evidence of the factors will preclude

---

[25] Act of May 31, 1993, 73rd Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3890 (expired Jan. 1, 2010) (current version at Tex. Bus. Orgs. Code Ann. § 152.052 (West 2012)).

the recognition of a partnership under Texas law. *Id.* at 898. "Even conclusive evidence of only one factor normally will be insufficient to establish the existence of a partnership." *Id.* Conclusive evidence of all the TRPA factors will establish the existence of a partnership as a matter of law. *Id.*

**Agreement to Share Profits**

Minnis testified that they were going to split profits "55/45 . . . [o]f any dollar that came in the door." We conclude that there is some evidence to support this factor. *See Hoss v. Alardin*, 338 S.W.3d 635, 643 (Tex. App.—Dallas 2011, no pet.) (holding that appellee's statement that profits were going to be split "50-50" was some evidence of the first TRPA factor).

**Expression of Intent to Be Partners**

The TRPA evaluates the parties' expression of intent to be partners as one factor, and it does not by its terms give the parties' intent or expression of intent any greater weight than the other factors. *Ingram*, 288 S.W.3d at 899. When analyzing expression of intent under the TRPA, courts should review the putative partners' speech, writings, and conduct. *Id.* Courts should only consider evidence not specifically probative of other factors. *Id.* at 900. There must be evidence that both parties expressed their intent to be partners. *Id.*

The terms used by the parties in referring to the arrangement do not control, and merely referring to another person as "partner" in a situation where the recipient of the message would not expect the declarant to make a statement of legal significance is not enough. *Id.* The term partner could constitute legally significant evidence of expression of intent when made in a circumstance that indicates significance to the business endeavor. *Id.* Courts should look to the terminology used by the putative partners, the context in which the statements were

35

made, and the identity of the speaker and listener.  *Id.*

Minnis testified that he and Citrin orally agreed to become partners.  Citrin testified that he probably asked Minnis to be his "partner," but the intent was for Minnis to become a co-owner in Cargo Ventures New York.  Citrin recalled that he signed a piece of paper that said, "We are partners.  Jake Citrin, Matt Minnis, 45% and 55%."  Minnis framed the agreement and hung it in his Cargo Ventures office.  Mark Pasquerella remembered seeing it.

A number of emails between Citrin and Minnis in which they referred to each other as partners were admitted into evidence.  Minnis frequently addressed Citrin as "partner" and referred to Citrin in emails to other people as his "partner."  In emails to Minnis, Citrin stated, "I think we have the makings of a tremendous partnership," and, "If we do not have trust we have no partnership."  Citrin referred to Minnis as his "new partner" to Mark Pasquerella, and Pasquerella testified that Citrin frequently referred to Minnis as his "partner."  Citrin stated to another person, "My partner, Matt Minnis, is actually leading the Web Site effort."

Citrin explained his use of the words "partner" and "partnership."  Citrin testified that he uses the term partner "often and loosely."  Citrin refers to lenders and tenants as partners—"it's anyone that we have a common business objective."  Citrin "used the word 'partnership' very loosely" to mean that he was going to "make Mr. Minnis a co-owner in Cargo Ventures New York."  Citrin explained that he used "the word 'partnership' in the loose sense because members to an LLC agreement aren't technically partners."  Citrin intended to have a formal business relationship with Minnis, which occurred when they signed the Cargo Ventures New York operating agreement.  Citrin testified that they only discussed the LLC structure.

36

We conclude that there is some evidence of an expression of intent to be partners by both Minnis and Citrin. *See Reagan v. Lyberger*, 156 S.W.3d 925, 928 (Tex. App.—Dallas 2005, no pet.) (holding there was some evidence of expression of intent where one defendant admitted that he referred to the second defendant as his partner, and other witnesses testified that the second defendant referred to the first defendant as his partner).

**Participation in Control of the Business**

The right to control a business is the right to make executive decisions. *Ingram*, 288 S.W.3d at 901. There was no evidence of who had the right to control the overarching partnership. Minnis admitted that the slip of paper stating that he and Citrin were partners did not say whether Citrin or Minnis was "management" or "marketing." While Minnis was president of Cargo Ventures New York, there is no such evidence as to titles or roles in the overarching partnership. We conclude there is no evidence of right to control.

**Agreement to Share Losses**

An agreement to share losses is not necessary to create a partnership. *Id.* at 902. While the absence of an agreement to share losses is not dispositive of the existence of a partnership, the existence of such an agreement could support the argument that a partnership existed. *Id.* With regard to losses, Minnis testified: "I figured I'd be responsible for whatever my share was and he was for his." We conclude there is no evidence of any agreement to share losses of the purported partnership.

**Contributing Money or Property to the Business**

The TPRA defines "property" as all property, real, personal, or mixed, tangible or intangible, or an interest in that property." *Id.* (citing TEX. REV. CIV.

STAT. art. 6132b-1.01(15)).[26] While Cullen 130 made a capital contribution to Cargo Ventures New York, there is no evidence that there was an agreement to contribute money or property to the partnership, or that Minnis or Citrin actually contributed money or property to the partnership. Minnis states in his brief: "Drawing on his established relationships, Minnis immediately pursued an opportunity to purchase six buildings across the country currently occupied by Eagle ('the Cove project')." Minnis was responsible for bringing the Cove portfolio to Citrin's attention before Cullen 130 became a member of Cargo Ventures New York. However, the purported partnership never had any involvement in the Cove portfolio. A Millennium entity, MP Cove Properties, LLC, owned the properties, and Cargo Ventures New York managed the properties pursuant to an August 4, 2004 management services agreement.

**Conclusion of Factors Analysis Under the TRPA**

There is some evidence of only two of the five TRPA factors—sharing profits and expression of intent. Considering the totality of the circumstances, we conclude as a matter of law that Minnis and Citrin did not create an overarching partnership, oral or otherwise. *See Lentz v. Eng'g, L.C. v. Brown*, No. 14-10-00610-CV, 2011 WL 4449655, at *4 (Tex. App.—Houston [14th Dist.] Sept. 27, 2011, no pet.) (mem. op.) (holding, under the totality of the circumstances, evidence of two factors, splitting profits and participating in control, did not establish the existence of a partnership). Because there is no partnership agreement, Minnis cannot show that there was detrimental reliance, and thus, no claim for fraudulent inducement. *See Haase*, 62 S.W.3d at 798.

---

[26] Under the Texas Business Organizations Code, "'Property,' includes tangible and intangible property and an interest in that property." TEX. BUS. ORGS. CODE ANN. § 1.002(77) (West 2012).

## B. Cullen 130/Citrin Holdings

Having rejected the Minnis Parties' first theory of fraudulent inducement, we turn to the second: Citrin Holdings fraudulently induced Cullen 130 to enter into the Cargo Entities operating agreements with Citrin Holdings. There is no dispute that Cullen 130 and Citrin Holding entered into the three operating agreements for the Cargo Entities. Instead, the Citrin Parties assert that Citrin Holdings' partial performance under the operating agreements negates Cullen 130's claim for fraudulent inducement.

A promise to act in the future constitutes fraud only when made with the intention, design, and purpose of deceiving, and with no intention of performing the act. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. *Aquaplex, Inc.*, 297 S.W.3d at 775. Failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made, but a circumstance to be considered with other facts to establish intent. *Spoljaric*, 708 S.W.2d at 435.

Because intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Id.* "'Slight circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Id.* However, "[p]artial performance can negate an intent not to keep a promise at the time it was made." *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

The Minnis Parties' primary contention in support of their claim that Citrin Holdings had no intention of performing under the operating agreements is Citrin

Holdings' breaches of the operating agreements—usurping Bronstein and MMT, failing to liquidate or distribute, ousting the Minnis Parties from the business, and transferring property, contracts, and cash flows into another Citrin-owned company.

In 2003, Citrin and Minnis discussed going into business together. At that time, Citrin owned 100% of Cargo Ventures New York. Pursuant to the September 30, 2004 Cargo Ventures New York operating agreement, Minnis's company, Cullen 130, was admitted as a member holding a 45% interest in the company. Citrin Holdings and Cullen 130 created Cargo Investors and Cargo Investors II for the purpose of holding interests in the single-purpose entities, which held title to acquired property. Until the time that Citrin removed Minnis as president of Cargo Ventures New York in December 2006, the Cargo Entities had acquired a portfolio consisting of a number of properties, which they were developing to lease to tenants.

Instead of "slight circumstantial evidence" of intent to defraud, we conclude that this record contains undisputed evidence of partial performance. We conclude that Citrin Holdings, by entering into the operating agreements for Cargo Investors and Cargo Investors II, which held the interests in the numerous single-purpose entities, partially performed its promise to acquire and develop properties for lease and, thus, negated Cullen 130's claim for fraudulent inducement.[27]

---

[27] *See Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1034–35 (5th Cir. 2010) (holding significant payment, among other factors, did not support inference that the defendant did not intend to pay); *Allamon v. Acuity Specialty Prods., Inc.*, 877 F. Supp. 2d 498, 525 (E.D. Tex. 2012) (holding partial performance of job guidelines by providing telemarketing employee with accounts lists required under guidelines negated fraud allegations that employer had no intention to perform under the guidelines when it entered into them); *In re Perry*, 423 B.R. 215, 284 (Bankr. S.D. Tex. 2010) (holding the plaintiffs' fraud claims failed because the debtor had partially performed the obligations under the agreement; the debtor's subsequent breach after partial performance showed that he intended to perform the contract in

We sustain the Citrin Parties' sixth issue and overrule the Minnis Parties' first conditional cross-point. Because there is no evidence of fraudulent inducement, the Minnis Parties cannot recover out-of-pocket damages.

## V. Conclusion

We hold that the trial court abused its discretion by finding the Minnis Parties' expert's testimony regarding damages reliable and sustain the Citrin Parties' second issue. Because the second issue applies to all of the Minnis Parties' claims, they cannot recover actual damages on Cullen 130's breach of fiduciary duty claim or any of the alternative claims. We further hold that there is no evidence of fraudulent inducement and sustain the Citrin Parties' sixth issue and overrule the Minnis Parties' first conditional cross-point. Consequently, the Minnis Parties may not recover out-of-pocket damages. Accordingly, we reverse the trial court's judgment and render judgment that the Minnis Parties take nothing on their claims against the Citrin Parties.[28] The Citrin Parties' motion for review of supersedeas ruling is denied as moot.

/s/    Sharon McCally
        Justice

Panel consists of Justices Boyce, McCally, and Mirabal.[29] (Mirabal, J., Dissenting)

---

its entirety at the time he signed the agreement); *Reyna v. First Nat'l Bank in Edinburg*, 55 S.W.3d 58, 68 (Tex. App.—Corpus Christ 2001, no pet.) (holding the appellees' tender of partial payment negated any claim that they had no intention of paying for equipment); *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 445–46 (Tex. App—Houston [14th Dist.] 1998, pet. denied) (holding there was no evidence of representation with intent not to perform where a party subsequently made payment on note for five years).

[28] Because of our disposition, it is not necessary to address any other issues raised in this appeal.

[29] Senior Justice Margaret Garner Mirabal sitting by assignment.